[Cite as *State v. Hawk*, 2013-Ohio-5794.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellee,                        :              No. 12AP-895
                                                                          (C.P.C. No. 11CR-10-5746)
v.                                                        :

                                                                           (REGULAR CALENDAR)
Jyshonne D. Hawk,                                :

     Defendant-Appellant.                      :

---

D E C I S I O N

Rendered on December 31, 2013

---

*Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

*Law Office of Blaise Baker*, and *Blaise Baker*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶ 1} Defendant-appellant, Jyshonne D. Hawk, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of attempted murder, felonious assault, and attendant firearm specifications.

{¶ 2} On October 31, 2011, appellant was indicted on one count of attempted murder, in violation of R.C. 2923.02 as it relates to R.C. 2903.02, and four counts of felonious assault, in violation of R.C. 2903.11. All counts in the indictment carried firearm specifications in violation of R.C. 2941.145. According to the state's evidence, in early October 2011, Delilah Collier ("Delilah") and her common-law husband, Cleophus Rumph-Holiday ("Cleo"), moved into one side of a double located at 1507 Duxberry

Avenue ("1507 Duxberry") in Columbus, Ohio, along with their children, 15-year old S.K., 8-year old M.H., and 11-month old C.R.  A porch extending between 1507 Duxberry and the other side of the double, located at 1505 Duxberry Avenue ("1505 Duxberry"), is separated only by a metal railing.

{¶ 3}    At approximately 11:30 p.m. on October 12, 2011, Delilah, Cleo, and S.K. were seated on the front porch of their house, listening to music.  Police officers arrived and reported they had received a complaint of loud music and that someone on the porch was holding a gun.  After finding no gun, the police admonished the group to turn down the music and then left.  Shortly thereafter, Delilah's nephew, Darrick Jordan, joined the group on the porch.

{¶ 4}    At approximately the same time, a woman named Brenda Peck, who lived across the street at 1510 Duxberry Avenue ("1510 Duxberry"), but at the time was sitting on the front porch of a double just east of 1507 Duxberry, shouted at Delilah to turn down the music.  Delilah accused Brenda of calling the police, and the two women exchanged heated words.  To avoid further confrontation with Brenda, Delilah went to an internet café with Cleo, Darrick, and the children.

{¶ 5}    The group returned to 1507 Duxberry sometime before 1:00 a.m. on October 13, 2011.  Cleo and the children went inside the house; Delilah and Darrick sat on the front porch smoking cigarettes.  Delilah and Darrick observed a light-skinned African-American man emerge from the front door of the house at 1510 Duxberry, holding what Delilah described as a "long gun."  (Tr. 55.)  According to Delilah, the man shouted "[w]ho in the fuck has a problem with me and my baby's mom over here."  (Tr. 57.)  As the man continued to shout, persons from inside 1510 Duxberry wrestled the gun from him and pulled him into the house.

{¶ 6}    Moments later, the light-skinned man exited 1510 Duxberry, removed his jacket and shirt, and ran into the street.  A dark-skinned African-American man wearing a hoodie sweatshirt walked to the bottom of the stairs at 1507 Duxberry and averred he had been trying to calm the light-skinned man.  The light-skinned man then ran onto the front porch at 1505 Duxberry and began arguing with Darrick.  Hearing the argument, Cleo and S.K. came out of the house.  The light-skinned man began shouting at Cleo and attempted to strike him.  Cleo struck the man in retaliation.

{¶ 7}    According to Delilah, the light-skinned man then removed a gun from his back pocket, fired several shots as he ran down the stairs from the porch, and ran away. S.K. and Darrick testified that the light-skinned man ran from the porch to the front yard after being struck by Cleo.  Darrick, S.K., and Cleo all testified that they did not actually see a gun in the man's hands when shots were fired.  However, Darrick testified that he heard gunshots, and Cleo and S.K. testified that they saw "fire," coming from the front yard where the man was standing. (Tr. 179, 242.)

{¶ 8}    Both Delilah and S.K. averred that the dark-skinned man ran from the front porch around the side of the house toward the back yard when the gunfire began.  Both testified that the dark-skinned man did not fire the shots.

{¶ 9}    Cleo was struck in the mid-section by multiple bullets and sustained serious injuries.  Delilah, Darrick, and S.K. were also shot.  Thereafter, the four victims ran inside the house.  Cleo dialed 911, and Delilah reported to the police dispatcher that she and several others had been shot by "people across the street."  (Tr. 84, exh. No. 33 (CD of 911 call.))  According to Delilah, the group retreated to the back of the house because they heard several gunshots outside.

{¶ 10}  Columbus Police Officer Zachary Rosen was dispatched to the scene at approximately 12:55 a.m.; he arrived less than a minute later.  He was directed to the scene by some people standing outside a house located at 1501 Duxberry Avenue ("1501 Duxberry").  When Officer Rosen arrived at 1507 Duxberry, he pounded on the door for a minute or two; when no one answered, he kicked in the door to gain entry.   Inside the house, he found four individuals who had sustained gunshot wounds.  The shooting victims were thereafter transported to various hospitals.

{¶ 11}  The police interviewed Delilah at the hospital.  At trial, Delilah admitted that during this interview, she spontaneously stated that she did not see a gun in the light-skinned man's hand.  She attributed this statement to the fact that she was traumatized by the shooting and was taking pain medications. She admitted, however, that during the same interview, she correctly recounted several other details of the shooting.  She averred at trial that she presently remembered seeing the light-skinned man remove a gun from his back right pocket and fire several shots.

{¶ 12} Columbus Police Detective Randy Vanvorhis interviewed Brenda Peck after the shooting and she consented to a search of 1510 Duxberry. During that search, police recovered an empty rifle case and an empty handgun case from the basement, ammunition from one of the bedrooms, and a baggie containing .22 caliber ammunition from the front yard. During a search of 1507 Duxberry, no guns or ammunition were recovered; however, spent shell casings were recovered from both the front porch and front yard. Detective Vanvorhis admitted that the police did not request expert analysis regarding bullet trajectory or fingerprint analysis of the shell casings recovered from 1507 Duxberry.

{¶ 13} Detective Vanvorhis eventually developed appellant as a suspect, and generated two photo arrays which included appellant's photograph. Because appellant had no criminal record at the time of the incident, the photograph used in the first array was taken from the LEADS database. This photo array was presented to Delilah and S.K. Delilah unequivocally identified appellant as the light-skinned African-American man who fired the shots on October 13, 2011. In the "Viewer's Statement" portion of the document accompanying the photo array, Delilah wrote "Photo number two [appellant] looks just like the person who came to my home and shot me and my family." (State's exh. No. 41(A)). S.K. circled appellant's picture in the photo array, but candidly admitted at trial that he told the police immediately after identifying appellant that he "[did not] know if that's him." (Tr. 186.) In the "Viewer's Statement" portion of the document accompanying the photo array, S.K. wrote "I thought it was photo #2 [appellant] but that's not the right person." (Tr. 186.) S.K. testified at trial, however, that there was only one light-skinned African-American man involved in the incident and that he was certain the dark-skinned man did not fire the shots.

{¶ 14} The second photo array, which included a mug shot of appellant following his arrest, was presented to Darrick and Cleo. Darrick was unable to identify appellant as the shooter. At trial, Darrick averred he told the police he could not make an identification because the shooter "had * * * fuller facial hair and he was high yellow." (Tr. 145; State's exh. No. 43A.) Cleo first identified a photograph of someone other than appellant as the shooter, but indicated he was only 50 percent certain of the identification and wanted to look at the photographs again "because they look[ed] alike." (State's exh.

No. 44(A.))  Cleo then selected appellant as the shooter and indicated he was "100% sure." (State's exh. No. 44A.)  He wrote in the "Viewer's Statement" portion of the document accompanying the photo array that "[#]5 [appellant] shot me on 13th." (State's exh. No. 44A.)

{¶ 15}  A few days before trial, S.K. identified a photograph of Jywaun Yoest, appellant's half-brother, as the dark-skinned African-American man present at the scene on October 13, 2011.  At trial, Delilah, Cleo, Darrick, and S.K. all identified appellant as the person who shot them.  Both Darrick and S.K. unequivocally testified that the dark-skinned man was not the shooter; rather, it was the light-skinned man.

{¶ 16}  Three additional witnesses, Verlin Peck, Shea Wade, and Nicole Wade testified about the events of October 12 and 13, 2011 as part of the state's case-in-chief. Verlin testified that he resided at 1510 Duxberry with his daughter, Brenda Peck, her children, and the children's father, appellant.  Sometime after midnight on October 13, 2011, Verlin was inside 1510 Duxberry performing household chores when he heard appellant run up and down the stairs.  Thereafter, Brenda told Verlin that appellant had taken a .22 rifle outside. Appellant's mother, Jeanetta Yoest, who lived next door at 1512 Duxberry, retrieved the rifle from appellant, unloaded it, and handed it to Verlin.  Verlin examined the rifle to ensure it contained no shells and then stored it in the basement. Soon thereafter, Brenda ran into the house, closed the front door, and reported that appellant had been in a fight outside and that "shots had occurred."  (Tr. 286-87.)  Verlin told her that she should get away from the door and protect her children.

{¶ 17}  At some point after the shootings, police took Verlin to the police station for questioning. Verlin told the police that Brenda told him that "Shonne shot a gun."  (Tr. 290.)[1]  The police performed a gunshot residue test on Verlin's hands, which revealed particles "highly indicative of a gunshot primer residue," and that such was consistent with a person having just discharged a firearm, having been in the vicinity of a firearm upon discharge, or having handled an item with gunshot primer residue on it.  (Tr. 288, State's exh. No. 40.)

---

[1] According to Verlin, appellant is known as "Shonne."

{¶ 18} At trial, Verlin admitted he did not see who fired the gunshots and did not even hear any gunshots being fired outside. He denied firing a weapon on October 13, 2011.

{¶ 19} At the time of the incident, Shea and Nicole Wade lived at 1501 Duxberry. Both were seated on their front porch and saw the neighbors at 1510 Duxberry wrestle a long gun away from appellant. According to the Wades, appellant did not go back inside 1510 Duxberry after the gun was taken away; rather, he immediately began arguing with the residents of 1507 Duxberry. He then walked toward the Wades and asked Shea whether he would confront a person who had been disrespectful to the mother of his child. When Shea responded affirmatively, appellant walked up on the porch at 1505 Duxberry. One of the men at 1507 Duxberry punched appellant, and he fell backward on the porch. Shea then heard several gunshots and saw appellant run away.

{¶ 20} According to Shea, appellant was wearing only sweatpants with red shorts underneath at the time of the shooting. He did not think appellant was the shooter because he did not see appellant with a gun, the gunshots began immediately after appellant was punched and fell down on the porch, and the shots came from the front yard and continued after appellant ran away from the scene. Although Shea admitted that he would not have been able to see a gun in the pocket of appellant's sweatpants, he averred that he did not think appellant had a gun in his pocket because his sweatpants were not "sagging." (Tr. 340.) Shea further testified that he told the police during interviews on October 24 and November 7, 2011 that appellant could not have been the shooter.

{¶ 21} Nicole testified that after the shots were fired, she heard someone shout, "it was Shonne, it was Shonne." (Tr. 368.) Nicole thought the person was mistaken because she did not see appellant with a gun when he was talking to Shea and she did not believe appellant would have had time to fire a gun after he was punched and fell backward on the porch. Nicole averred that she told police in an interview on November 15, 2011 that appellant could not have fired the shots because they came from the front yard of 1507 Duxberry and he was standing on the porch of 1505 Duxberry at the time. She further averred that she told a defense investigator in May or June 2012 that she observed an African-American male wearing dark clothing exit 1510 Duxberry and try to defuse the

situation between appellant and the people at 1507 Duxberry.  Nicole admitted that she saw no one other than appellant arguing with the residents of 1507 Duxberry, and that appellant was "upset" and "out of  *  *  * control" during the incident. (Tr. 389.)

{¶ 22}  Appellant was arrested on October 21, 2011.  On December 2, 2011, the police recovered a firearm from an abandoned house located at 260 South Fourth Street.  A test fire of that firearm established its operability, and comparison of spent shell casings from the test fire with information obtained from a national ballistics database revealed a match with shell casings recovered from both the October 13, 2011 shooting and a shooting on November 8, 2011.  Police did not request fingerprint analysis of the gun recovered on December 2, 2011.

{¶ 23}  Several witnesses, including appellant, testified on appellant's behalf.  According to these witnesses, at the time of the incident, Brenda and Jeanetta were sitting with Mona Lisa Conley and her minor grandchildren, T.J. and Q.C., on the front porch of Lisa's house at 1511 Duxberry.  Following the argument between Brenda and Delilah, appellant and Jywaun arrived at Lisa's house.  According to Lisa, an African-American man emerged from 1507 Duxberry and stared at the group seated on Lisa's porch; Lisa admonished Jywaun not to say anything to the man.  Appellant and Jywaun then left Lisa's house.  Appellant walked across the street to his house.  As Jywaun walked away, he slipped on the steps; Jeanetta, Lisa, and T.J. observed a black-handled gun protruding from his right pocket.  Jeanetta was not surprised Jywaun had a gun because he had carried one with him for several years.

{¶ 24}  A short time later, appellant exited his house carrying a "long gun."  (Tr. 518.)  Jeanetta left Lisa's porch and walked over to help Brenda and Verlin get the rifle away from appellant.  Jeanetta testified she did so because she knew he was angry about the confrontation between Brenda and Delilah and she was afraid of what he would do with a gun.  Appellant eventually went back into the house, but emerged a short time later and walked onto the porch at 1505 Duxberry.  Jeanetta followed appellant because she wanted to stop him from fighting with the neighbors.  According to Jeanetta, appellant did not have a gun at this point.

{¶ 25}  At the same time, Jywaun walked to the bottom of the steps at 1507 Duxberry and attempted to mollify the situation between the neighbors and appellant.

According to both T.J. and Lisa, Delilah went inside her house and emerged with what they believed to be a gun and handed it to one of the men on the porch. Lisa testified that she heard the sound of a gun click at 1507 Duxberry and went inside her house. She heard gunshots immediately thereafter, but did not see who fired the shots.

{¶ 26} According to T.J. and Jeanetta, Cleo hit appellant while appellant was standing on the porch at 1505 Duxberry. Jeanetta testified that after Cleo hit appellant, she saw Jywaun standing in the front yard with his arm extended and a gun in his hand, firing several shots. T.J. testified that although he did not actually see Jywaun pull the trigger, he "seen the gunfire come from the spot [Jywaun] was standing." (Tr. 555.) T.J. was certain that Jywaun fired the gun, and that no shots were fired from the porch at 1505 Duxberry. Q.C. confirmed T.J.'s testimony that Jywaun was standing at the bottom of the steps at 1505 Duxberry when the shots were fired. Q.C. testified that he did not actually see Jywaun fire a weapon; however, he observed the flash of a gun from the spot where Jywaun was standing. Both appellant and Jywaun then ran from the scene.

{¶ 27} Immediately after the shooting, Lisa heard her neighbor, Trish, yell "Shonne, you did this, this is your fault. Shonne, ain't nobody done this but you, Shonne." (Tr. 526-27.) When the police arrived, she overheard Delilah report that "the white guy Shonne across the street did it." (Tr. 527.)

{¶ 28} Lisa, T.J., Q.C., and Jeanetta testified that they did not immediately inform the police about what transpired on October 13, 2011 because they were distrustful of the police. Lisa and T.J. first recounted their versions of the events to a defense investigator in May 2012. After appellant was arrested, Jeanetta told Jywaun he should tell the police he was the shooter. Jeanetta admitted that she not tell the police that Jywaun was the shooter until June 2012.

{¶ 29} Appellant testified that he and Jywaun returned to the Duxberry Avenue neighborhood late on October 12, 2011 after drinking at a friend's house. The two men joined Brenda, Jeanetta, and Lisa on Lisa's front porch. After smoking marijuana, appellant walked to his house with Brenda. Brenda told him that the neighbors at 1507 Duxberry Avenue had been "rude and nasty" to her, calling her names and accusing her of calling the police on them. (Tr. 590.) Appellant was immediately angry and left his house

to confront the neighbors.  When he challenged Delilah about her argument with Brenda, Delilah threatened to have her boyfriend beat him up.

{¶ 30}  Appellant returned to his house and retrieved a .22 rifle from upstairs because he "had an attitude" and he knew the people at 1507 Duxberry had guns and shot them every day. (Tr. 591.)  According to appellant, the rifle was not loaded; however, he put a baggie of .22 caliber ammunition in his jacket pocket on the way out the door. Jeanetta, Brenda, and Verlin wrestled the rifle away from him.

{¶ 31}  Appellant then ran into the street and started arguing with Cleo, who was standing in the doorway of 1507 Duxberry.  While he was arguing with Cleo, Darrick walked down the steps from the porch and stood near Jywaun.  Because he thought Darrick wanted to fight him, appellant removed his jacket and placed it on the ground near his front yard.  As he did so, the baggie of bullets fell out of the pocket.

{¶ 32}  Appellant then walked to the Wades' front yard and asked Shea what he would do if someone made disrespectful comments to the mother of his child.  When Shea responded that he would confront such a person, appellant walked onto the porch at 1505 Duxberry and continued to argue with Cleo.  Cleo punched appellant, and appellant immediately saw a "flash" coming from the front yard, near the area where Jywaun and Darrick had been standing.   (Tr. 599.) Appellant assumed he was the target of the shooting, so he ran away.

{¶ 33}  As he was running, he noticed Jywaun running behind him in the same direction.  Jywaun told him that he fired the shots because the people at 1507 Duxberry had a gun and were going to shoot him and appellant.  When appellant returned to his house about an hour later, he saw the police canvassing the neighborhood.  He did not tell the police what had happened because he was afraid to do so.

{¶ 34}  Appellant later learned that the police were looking for him, and he attempted, albeit unsuccessfully, to contact them.  Following his October 21, 2011 arrest, he provided a statement to the police.  He did not tell the police that Jywaun had fired the shots because Jywaun is his brother and appellant did not fully understand that he was being charged with a crime.

{¶ 35}  Appellant acknowledged that he and Jywaun have easily distinguishable skin tones—appellant is light-skinned, while Jywaun is dark-skinned.   Appellant denied

that he was armed with another gun after the rifle was taken away from him, and averred that he did not believe he needed a gun because he knew Jywaun was carrying one. He admitted that Jywaun and Darrick were not arguing with one another, and that Jywaun was not the one who was "outraged" and "out of control." (Tr. 616.) He denied firing the shots on October 13, 2011.

{¶ 36} On June 22, 2012, Detective Vanvorhis received a telephone call from a person who identified himself only as appellant's brother; the call was audiotaped. Appellant identified the voice on the audiotape as that of Jywaun. The audiotape was played for the jury at trial. The transcript of the call establishes that the caller stated he had committed the crimes with which appellant had been charged, and that he wanted to turn himself into the police, "but only if my brother is for sure that he can get out." (Tr. 670.) According to Detective Vanvorhis, the caller never provided a statement in person.

{¶ 37} Following deliberations, the jury returned verdicts finding appellant guilty on all counts charged in the indictment. The trial court sentenced appellant by judgment entry filed October 3, 2012.

{¶ 38} On appeal, appellant sets forth the following two assignments of error:

> [I]. THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING HEARSAY TESTIMONY PREJUDICIAL TO APPELLANT THEREBY DEPRIVING HIM OF HIS RIGHT OF CONFRONTATION GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
>
> [II]. THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY ENTERING JUDGMENTS OF CONVICTION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16, OF THE OHIO CONSTITUTION.

{¶ 39} In his first assignment of error, appellant contends the trial court abused its discretion by admitting prejudicial hearsay testimony at trial. Specifically, appellant challenges Verlin's testimony recounting Brenda's statement that "Shonne shot a gun."

{¶ 40} In a sidebar prior to calling Verlin as a witness, the prosecutor explained that Verlin would testify that prior to the police arriving at his house following the shooting, Brenda told him that appellant "shot those people." (Tr. 275.) Noting Officer Rosen's testimony that he arrived at the scene within a minute of receiving the 911 call, the prosecutor argued that Verlin's testimony about Brenda's statement should be admitted pursuant to Evid.R. 803(1), the present sense impression exception to the hearsay rule, as Brenda made the statement "immediately * * * after the incident." (Tr. 275.) Defense counsel objected, maintaining that Brenda's statement did not qualify as a present sense impression because she did not make the statement at the time she observed the incident or immediately thereafter. The trial court ruled that it would admit the statement under Evid.R. 803(1). As noted above, Verlin testified that he recounted to the police Brenda's statement to him that "Shonne shot a gun."

{¶ 41} The admission or exclusion of evidence lies within the sound discretion of the trial court. *State v. Banks,* 10th Dist. No. 03AP-1286, 2004-Ohio-6522, ¶ 12, citing *State v. Sage,* 31 Ohio St.3d 173 (1987). An abuse of discretion connotes more than an error of law or judgment; rather, the trial court's decision must be unreasonable, arbitrary or unconscionable. *Banks*, citing *Blakemore v. Blakemore,* 5 Ohio St.3d 217 (1983). A reviewing court will not reverse a trial court's ruling unless the trial court has abused its discretion to the prejudice of the complaining party. *Hyams v. Cleveland Clinic Found.,* 8th Dist. No. 97439, 2012-Ohio-3945, citing *Yaeger v. Fairview Gen. Hosp.,* 8th Dist. No. 72361 (Mar. 11, 1999), citing *Bostic v. Connor*, 37 Ohio St.3d 144 (1988).

{¶ 42} Evid.R. 801(C) defines "hearsay" as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Banks* at ¶ 18. A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person, if it is intended by him as an assertion. Evid.R. 801(A); *State v. Holloway,* 10th Dist. No. 02AP-984, 2003-Ohio-3298, ¶ 15. An assertion, for hearsay purposes, is a statement about an event that happened or a condition that existed. *Id.*, citing *State v. LaMar,* 95 Ohio St.3d 181, 197, 2002-Ohio-2128. Hearsay is generally inadmissible. Evid.R. 802. However, Evid.R. 803 sets forth categories of hearsay that are exempted from the exclusionary rule. One such category, the present sense impression, is at issue here.

{¶ 43} The present sense impression exception permits the admission of a hearsay statement, whether or not the declarant is available as a witness, if the statement "describ[es] or explain[s] an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1).

{¶ 44} The Staff Note to Evid.R. 803(1) states:

> Present sense impressions are those declarations made by an observer at the time the event is being perceived. The circumstantial guaranty of trustworthiness is derived from the fact that the statement is contemporaneous and there is little risk of faulty recollection, and it is made to another who is capable of verifying the statement at the time it is made.
>
> One of the principle elements of the circumstantial guaranty of trustworthiness of this exception is that the statement was made at a time and under circumstances in which the person to whom the statement was made would be in a position to verify the statement.

{¶ 45} Appellant contends that Brenda's statement to Verlin that "Shonne shot a gun" does not satisfy the guarantee of trustworthiness required by the present sense impression hearsay exception. Appellant first contends there is no evidence that Brenda made the statement immediately after perceiving the event, as none of the testimony definitively established the amount of time that passed between the shooting and Brenda's statement. Appellant maintains that the only testimony presented as to the timing of the events related solely to the amount of time that elapsed between the 911 call and the police arriving at 1507 Duxberry, which varied from one minute to as much as ten minutes, and that no evidence established exactly how much time elapsed between the shooting and the arrival of the police at the Peck residence.

{¶ 46} Appellant further challenges the trustworthiness of Brenda's statement on grounds that Verlin was not in a position to verify its accuracy. In support, appellant relies on *State v. Williams,* 6th Dist. No. L-90-175 (Aug. 16, 1991), where the court averred that a statement made to an individual who was not capable of verifying it because the individual was not present at the event weighed heavily against the trustworthiness of the statement. Appellant maintains that because Verlin was not

No. 12AP-895 13

present to observe the shooting himself, he could not provide a check on the accuracy of Brenda's statement. Appellant points to Verlin's testimony that he was inside the house and unaware that a shooting had occurred until Brenda told him about it.

{¶ 47} Appellant also asserts that Verlin's status as a potential suspect at the time he revealed Brenda's statement indicates a lack of trustworthiness. Appellant notes that Verlin related Brenda's statement to the police after he had been handcuffed, detained, transported to the police station for questioning, and positively identified as having gunshot residue on his hands. Appellant contends that under such circumstances, Verlin had a motive to implicate someone other than himself as the shooter, and that motive to avoid criminal charges implies a lack of trustworthiness.

{¶ 48} The state responds that Brenda's statement qualifies as a present impression because it was made immediately after the shooting. The state contends the evidence establishes that Brenda made the statement immediately after she ran inside the house. The state further notes that Officer Rosen's testimony established that he arrived at the scene within one minute of the 911 call. The state maintains that the spontaneity and timing of the statement demonstrates its trustworthiness, as there was no time for reflection or faulty recollection.

{¶ 49} The state also opposes appellant's claim that Brenda's statement lacked trustworthiness because Verlin did not observe the shooting and thus was not in a position to verify the statement. The state notes that Evid.R. 803(1) does not include a requirement that both the declarant and the witness who heard the statement actually observe the event; rather, only the staff note cautions that the trial court should assess whether the declarant made the statement to an individual who would be in a position to verify the statement. In support of its position, the state cites cases holding that statements may qualify as present sense impressions despite the lack of corroboration. *State v. Wages,* 87 Ohio App.3d 780, 788 (8th Dist.1993); *State v. Lester,* 9th Dist. No. 16691 (Dec. 14, 1994).

{¶ 50} Assuming arguendo that Brenda's statement did not qualify as a present sense impression exception to the hearsay rule, we find that any error in admission of the statement was harmless. "The test for determining whether the admission of inflammatory or otherwise erroneous evidence is harmless and non-constitutional error

requires the reviewing court to look at the whole record, leaving out the disputed evidence, and then to decide whether there is other substantial evidence to support the guilty verdict." *State v. Britton,* 5th Dist. No. 09 CAA 02 0016, 2010-Ohio-2061, ¶ 37, citing *State v. Riffle,* 5th Dist. No. 2007-0013, 2007-Ohio-5299, ¶ 36-37. "Error is harmless beyond a reasonable doubt when the remaining evidence constitutes overwhelming proof of the defendant's guilt." *Britton* at ¶ 37, citing *State v. Williams,* 38 Ohio St.3d 346, 349-50 (1988).

{¶ 51} In the present case, independent evidence established appellant as the shooter. Delilah testified that she observed appellant remove a gun from his back pocket and fire several shots at her, Cleo, S.K., and Darrick. Darrick, S.K., and Cleo testified that they either heard gunshots or saw gun flashes coming from the front yard where appellant ran after he was struck by Cleo. Both Delilah and Cleo unequivocally identified appellant as the shooter from photo arrays, and all four shooting victims positively identified appellant at trial. Further, both prosecution and defense witnesses testified that appellant perceived Delilah's confrontation with Brenda as an affront to the mother of his child, and that he reacted to this slight immediately, angrily, and impulsively by retrieving a weapon from his house. Both appellant and his mother testified that appellant had ongoing anger management issues. In addition, appellant fled from the scene after the shots were fired. Because independent evidence established appellant's guilt, any error in the admission of Verlin's testimony regarding Brenda's statement was harmless.

{¶ 52} The first assignment of error is overruled.

{¶ 53} In his second assignment of error, appellant argues his convictions were against the manifest weight of the evidence. When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most

" 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, quoting *Martin*; *State v. Strider-Williams,* 10th Dist. No. 10AP-334, 2010-Ohio-6179, ¶ 12.

{¶ 54} In addressing a manifest weight of the evidence argument, a reviewing court may consider witness credibility. *State v. Cattledge,* 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, a court is guided by the presumption that the jury " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflictions, and use these observations in weighing the credibility of the proferred testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). Thus, a reviewing court must defer to the factual findings of the jury regarding the credibility of the witnesses. *Id.,* citing *State v. DeHass,* 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶ 55} Appellant essentially claims that the jury clearly lost its way and created a manifest miscarriage of justice by believing the testimony of the state's witnesses that he was the assailant and in rejecting his claim that his half-brother, Jywaun Yoest, shot the victims.

{¶ 56} Appellant first asserts that Delilah inconsistently testified as to whether she actually saw appellant fire the shots. Appellant notes that while Delilah was hospitalized immediately after the shooting, she spontaneously told the police that she did not see a gun in appellant's hand. Later, at trial, Delilah testified that she observed appellant pull a gun out of his back pocket and start shooting. A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. *State v. Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact is in the best position to take into account inconsistencies in a witness's testimony, along with the witness's manner and demeanor, and to determine whether the witness's testimony is credible. *State v. Wiliams,* 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58. In the present case, defense counsel had the opportunity to cross-examine Delilah about her conflicting statements, and she offered an explanation as to why she made the statement in the hospital. Under these circumstances, it was within the province of the jury to assess the credibility of Delilah's testimony as to whether she actually saw appellant with a gun.

Moreover, we note that Delilah unequivocally identified appellant as the shooter from the photo array and at trial.

{¶ 57} Appellant also points out that Cleo, Darrick, and S.K. all testified that they did not observe appellant with a gun in his hand during the incident. While all three candidly admitted that they did not actually see appellant with a gun, they testified that either gunshots or gun flashes came from the front yard where appellant was standing after he ran off the porch. Further, Cleo identified appellant as the shooter from a photo array and at trial, and both Darrick and S.K. made in-court identifications of appellant.

{¶ 58} Appellant further contends that testimony offered by the Wades and defense witnesses established that Jywaun, and not appellant, was the shooter. Specifically, appellant notes the Wades' testimony that they did not see appellant with a gun and that the timing and direction of the gunshots established that appellant could not have fired the shots. Appellant also notes that Lisa, T.J., and Jeanetta all testified that Jywaun had a gun in his back pocket immediately prior to the shooting, that Jeanetta testified that she saw Jywaun with a gun in his hand firing several shots, and that T.J. and Q.C. testified that they observed gun flashes from the spot Jywaun was standing. Appellant further notes that after the shooting, Detective Vanvorhis received a call from a person who identified himself as appellant's brother and confessed to committing the crime. In addition, appellant cites his own testimony that Jywaun told him he shot the victims because they had a gun and were going to shoot him and appellant.

{¶ 59} A conviction is not against the manifest weight of the evidence because the jury chose to believe the state's version of events over the defendant's version. *State v. Webb,* 10th Dist. No. 10AP-189, 2010-Ohio-5208, ¶ 16. The jury is free to believe or disbelieve any or all of the testimony. *Strider-Williams* at ¶ 13. While testimony offered by the Wades and defense witnesses suggested that Jywaun, rather than appellant, committed the shootings, testimony from the four victims refutes that evidence. The jury was free to believe the victims' testimony and disbelieve appellant's witnesses. That decision was within the province of the jury. *State v. Williams,* 10th Dist. 08AP-719, 2009-Ohio-3237, ¶ 18-19. Our review of the transcript does not lead us to conclude that the jury was clearly wrong to do so.

{¶ 60} Finally, appellant contends that no physical evidence tied him to the shootings. Specifically, appellant argues that the state presented no evidence of stippling or gun powder residue despite its contention that appellant fired the first shots at Cleo from close range. Appellant also maintains that the state presented no definitive evidence as to the location of the spent shell casings. Lastly, appellant notes that the handgun identified as the one used in the shooting at 1507 Duxberry was used in a subsequent, unrelated shooting that occurred while appellant was in jail.

{¶ 61} Assuming arguendo that the physical evidence presented by the state did not definitively prove appellant was the shooter, such does not mean that appellant was wrongfully convicted. The outcome of this case hinged upon the evaluation of eyewitness testimony, including the jury's assessments of the credibility of the various witnesses.

{¶ 62} Moreover, in addition to the identification of appellant by all four shooting victims, circumstantial evidence supported the jury's verdicts. As we noted in our discussion of the first assignment of error, witnesses testifying for both the state and the defense averred that appellant's immediate reaction upon hearing about the confrontation between Brenda and Delilah was to retrieve a weapon from his house. Indeed, appellant admitted that he "had an attitude" and was "outraged" and "out of control." In addition, appellant's flight from the scene after the shots were fired "negate[d] his claimed lack of culpability and, instead, demonstrate[d] furtive conduct reflective of a consciousness of guilt." *State v. Mitchell,* 10th Dist. No. 10AP-756, 2011-Ohio-3818, ¶ 29.

{¶ 63} The record does not indicate that this is the rare case where the jury lost its way, resulting in a manifest miscarriage of justice. We thus conclude that appellant's convictions are not against the manifest weight of the evidence.

{¶ 64} The second assignment of error is overruled.

{¶ 65} Having overruled appellant's first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

CONNOR and DORRIAN, JJ., concur.

_____