[Cite as *State v. Thomas*, 2024-Ohio-5662.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                  :

       Plaintiff-Appellee,        :          No. 23AP-129
                                               (C.P.C. No. 21CR-4199)

v.                           :

                                               (REGULAR CALENDAR)

Robert Thomas,              :

       Defendant-Appellant.    :

                                    :

---

D E C I S I O N

Rendered on December 3, 2024

---

**On brief:** *G. Gary Tyack,* Prosecuting Attorney, and *Taylor M. Mick*, for appellee.
**Argued**: *Taylor M. Mick.*

**On brief:** *Samuel H. Shamansky Co, L.P.A., Samuel H. Shamansky, Donald L. Regensburger,* and *Ashton C. Gaitanos*, for appellant.
**Argued:** *Samuel H. Shamansky.*

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Defendant-appellant, Robert Thomas, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to a jury trial, which found him guilty of aggravated menacing. For the reasons that follow, we affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On October 7, 2021, Thomas was indicted by a Franklin County Grand Jury on one count of involuntary manslaughter, a felony of the third degree, in violation of R.C. 2903.04 (Count One); and one count of aggravated menacing, a misdemeanor of the first

degree, in violation of R.C. 2903.21 (Count Two). The charges stemmed from a confrontation on June 20, 2021, which resulted in the death of the victim in this case, J.K. In November 2022, the matter proceeded to a jury trial at which the following evidence was adduced.

{¶ 3} C.K., the wife of J.K., was raised by her grandparents, Verna and Cordell Williams, in their home on Walnut Hill Drive. (Nov. 15, 2022 Tr. Vol. I at 4-5, 17.)[1] C.K. and her grandparents lived across the street from Thomas. (Tr. Vol. I at 7-9, 22.) C.K. grew up playing with Thomas' children around the neighborhood and, prior to 2011, did not have any problems with Thomas or his family. (Tr. Vol. I at 8-9.)

{¶ 4} According to C.K., there were several incidents involving Thomas that led to the confrontation on June 20, 2021. C.K. first testified to the "car incident" in 2011. (Tr. Vol. I at 19.) According to C.K., Thomas tailgated her on the highway and "flick[ed] her off" as he drove away. (Tr. Vol. I at 19.) Mr. Williams confronted Thomas' wife about the incident, which seemed to resolve the issue. (Tr. Vol. I at 20.) C.K. testified that while some members of the Thomas family attended her wedding, Thomas was not present. (Tr. Vol. I at 22.) C.K. acknowledged that she did not have an issue with Thomas not attending her wedding. (Tr. Vol. I at 22.) In November 2018, there was an incident between Thomas and J.K. on Walnut Hill Drive. (Tr. Vol. I at 25, 27.) According to C.K., upon arriving at the Williams home for Thanksgiving, J.K. let her out of the vehicle then proceeded to pull into Thomas' driveway to turn around. (Tr. Vol. I at 28.) C.K. testified that Thomas confronted J.K. by his vehicle for turning around in his driveway. (Tr. Vol. I at 25, 28-29.) C.K. agreed with the characterization that Thomas approached J.K. in a "provocative way." (Tr. Vol. I at 26.)

{¶ 5} On June 20, 2021, C.K. and J.K. attended a Father's Day event at the Williams' home on Walnut Hill Drive. (Tr. Vol. I at 30-31.) At the conclusion of the celebration, C.K. and J.K. walked down the driveway toward their vehicle. (Tr. Vol. I at 34.) According to C.K., when they approached the vehicle, Thomas "was just there. I don't even know how to describe it. I mean, he was just there." (Tr. Vol. I at 34.) C.K. testified that as Thomas approached, he was attempting to load his rifle. (Tr. at 34-35; Nov. 16, 2022 Tr.

---

[1] Prior to trial Mr. and Mrs. Williams both passed away from COVID-19. (Tr. Vol. I at 83.)

Vol. II at 26.) C.K. twice asked Thomas, "what are you doing?" to which he replied, "[H]e didn't tell you?" (Vol. I Tr. at 35.) C.K. screamed for help while J.K. attempted to slap the magazine out of Thomas' hands. (Tr. Vol. I at 35.) C.K. described the two men fighting over possession of the rifle. (Tr. Vol. I at 35-36.) C.K. testified that her grandfather then ran down the driveway and entered the struggle over the firearm. (Tr. Vol. I at 26.) C.K. called the police to report the incident then heard gunfire. (Tr. Vol. I at 36.) According to C.K., J.K. appeared dead at this point. (Tr. Vol. I at 47.) C.K. testified that Thomas did not fire his rifle as he was disarmed by either Mr. Williams or J.K. (Tr. Vol. I at 66, 78.)

{¶ 6} According to C.K., her grandfather confronted another neighbor, later identified as Elias Smith, regarding the shooting. (Tr. Vol. I at 38, 69.) When Mr. Williams asked if Smith had shot J.K., Smith indicated "yes" but did not explain. (Tr. Vol. I at 69.) When Smith or his brother approached, C.K. told them to get away. (Tr. Vol. I at 41.) At some point, Mr. Williams disarmed Smith, and he went back into his residence. (Tr. Vol. I at 45, 69-70.) Mr. Williams then told Thomas to "pick up his stuff and go," which he complied. (Tr. Vol. I at 36-37, 58, 70.) C.K. testified that her husband, when confronted by Thomas, was "[a]bsolutely" in fear for his safety. (Tr. Vol. I at 76.) C.K. testified that she was also in fear for her safety. (Tr. Vol. I at 76.)

{¶ 7} Charisse Penn, C.K.'s mother, testified that she was in the laundry room when the altercation took place. (Tr. Vol. II at 51.) According to Penn, Thomas approached the couple with the firearm at his side then raised it up when he got to them. (Tr. Vol. II at 52.) According to Penn, Thomas was not pointing his gun at the couple, but he was "confront[ing]" them with it. (Tr. Vol. II at 52.) Penn stated that the firearm "was up and he's talking." (Tr. Vol. II at 52.) Penn testified that the "panicked voice yelling in th[e] video" was her voice. (Tr. Vol. II at 53.) "I'm yelling that way because at that point I am in fear for [C.K.'s] life and [J.K.'s] life." (Tr. Vol. II at 53.) According to Penn, J.K. and Thomas fought over the gun before Mr. Williams entered the altercation. Penn testified that it is unclear who disarmed Thomas. (Tr. Vol. II at 55, 66.) Mr. Williams, J.K., and Thomas were all standing up and the gun and magazines were on the ground. (Tr. Vol. II at 55.) Penn saw Smith "open[] the door" of his home with a firearm, marked as State's Exhibit A-2, and then heard gunshots before J.K. fell to the ground. (Tr. Vol. II at 55, 67.) Penn yelled,

"why did you do that?," which Smith replied, "he didn't know why he did it." (Tr. Vol. II at 55-56.)

{¶ 8} Officers Michelle Reynolds-Parra and Frederick Kaufman testified that they responded to the incident on Walnut Hill Drive on June 20, 2021. (Tr. Vol. II at 75-128.) Both Reynolds-Parra and Kaufman testified to the efforts to render aid to J.K. at the scene as well as evidence gathered in the hours after the shooting. (Tr. Vol. II at 126.) Smith was also formally called as a witness, but he asserted his Fifth Amendment right against self-incrimination and did not answer any questions. (Tr. Vol. II at 128.)

{¶ 9} Officer David Wrenn testified that he was present when Smith came out of his home and assisted in taking him into custody. (Tr. Vol. II at 135.) Wrenn provided additional testimony as to his body-cam video that recorded the arrest. During the video, Smith stated, "I fired a few shots. I thought somebody was going to get killed." (Tr. Vol. II at 139.) Officer Todd Cress, an officer assigned to the crime scene search unit, testified as to the scene at the Williams residence on June 20, 2021. (Tr. Vol. II at 174.) Cress provided testimony regarding photographs and other evidence gathered at the crime scene. (Tr. Vol. II at 173-218.)

{¶ 10} Caleb Worley is a forensic scientist with the firearms identification section of the Columbus Police Department Crime Lab. (Tr. Vol. II at 142-43.) Worley testified to his education and experience and was declared an expert in the area of firearm examination. Worley provided testimony as to the three firearms involved in this case. (Tr. Vol. II at 145, 152.) Worley examined Thomas' SKS rifle, marked as State's Exhibit A-1, and testified that the gun will have a magazine, which holds the ammunition and is inserted into the gun. (Tr. Vol. II at 146-47.) Once the magazine is inserted, the bolt will be pulled back and then released. (Tr. Vol. II at 147.) Worley testified that the rifle could be fired without the magazine in it. (Tr. Vol. II at 148.) Worley concluded that the rifle was fully functional. (Tr. Vol. II at 145-46, 148.) The second firearm was Smith's AR-15 type rifle of unknown make, identified as State's Exhibit A-2. (Tr. Vol. II at 152.) Worley testified that the gun lacked a serial number and was potentially made at home. (Tr. Vol. II at 155.) Worley concluded that the firearm was operable after he tested the rifle. (Tr. Vol. II at 155.) The final firearm Worley examined was J.K.'s Kel-Tec pistol, marked as State's Exhibit A-4, which he also concluded as operable. (Tr. Vol. II at 158, 160.)

{¶ 11} Detective Ronald Lemmon testified that he responded to the scene at Walnut Hill Drive on the night in question. (Tr. Vol. II at 220.) Lemmon testified that he interviewed family members and other witnesses at the scene. (Tr. Vol. II at 222.) Lemmon also interviewed Thomas at police headquarters. (Tr. Vol. II at 223.) During the interview, Thomas alleged that J.K. had damaged his tires, put herbicide on his lawn, and vandalized his property. (Tr. Vol. II at 227.) According to Lemmon, Thomas acknowledged that the day he approached J.K. with a gun, he was trying to "scare" J.K. so he would stay off Thomas' property. (Tr. Vol. II at 227.) While Thomas did not have any direct evidence of J.K. damaging his property, he had a "hunch." (Tr. Vol. II at 227, 233.) Thomas also indicated a long-standing grievance that he believed he was given the incorrect address for the wedding of J.K. and C.K. (Tr. Vol. II at 244.) According to Thomas, J.K. figured out the firearm was unloaded, and he "wasn't going to do anything." (Tr. Vol. II at 229.) Thomas stated that the fight was not over the gun, and he was not concerned when Mr. Williams grabbed the rifle. (Tr. Vol. II at 230-31.) Thomas explained the rifle was unloaded because he "didn't want to hurt anybody" though he restated that he was trying to scare J.K. (Tr. Vol. II at 231-32.) Thomas testified that after the altercation, J.K. pulled out his own gun at which point "two shots rang out." (Tr. Vol. II at 232-34.) In response to Lemmon's question, "when you pulled your gun, you just walked up and pointed it at him; you didn't say anything to him?" Thomas responded, "Yes." (Tr. Vol. II at 232.) Thomas then stated that "[he] didn't point [the gun] at him." (Tr. Vol. II at 233.) The parties stipulated to the coroner's report that the cause of death was multiple gunshot wounds. (State's Ex. C-1.)

{¶ 12} On November 18, 2022, the jury returned a verdict of not guilty on the charge of involuntary manslaughter but guilty of aggravated menacing. The trial court held a sentencing hearing on December 15, 2022. The trial court sentenced Thomas to 180 days in jail with 174 suspended. Thomas received 6 days of jail-time credit. The trial court then imposed a 5-year term of intensive supervision, $1,000 fine, and restitution in the amount of $2,035.86. Thomas was also placed on house arrest at his own expense for a period of two years. Finally, the trial court imposed a condition that his residence was "subject to search by Probation or law enforcement at any time for weapons." (Emphasis omitted.) (Dec. 29, 2022 Jgmt. Entry.)

{¶ 13} On February 24, 2023, Thomas sought leave to file a delayed appeal in this matter. The state filed a memorandum in opposition on March 7, 2023. We granted Thomas' motion on April 11, 2023.

## II. ASSIGNMENTS OF ERROR

{¶ 14} Appellant assigns the following as trial court error:

> [I.] Appellant's conviction was against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.
>
> [II.] Appellant's sentence, which includes a two-year period of house arrest at his own expense for a misdemeanor conviction as well as authorizing unrestricted residential searches, violates his right against cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution[].
>
> [III.] The trial court's failure to advise Appellant of the mandatory warning contained in R.C. 2929.25 rendered Appellant's sentence contrary to law.

## III. LEGAL ANALYSIS

### A. Thomas' First Assignment of Error

{¶ 15} Thomas first contends that his conviction of aggravated menacing was against the manifest weight of the evidence.

{¶ 16} The criminal standard of manifest weight of the evidence addresses the evidence's effect in inducing belief. *State v. Stewart*, 10th Dist. No. 23AP-203, 2024-Ohio-1448, ¶ 23, citing *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. A manifest weight challenge attacks the credibility of the evidence and considers whether the state met its burden of persuasion. *State v. R.J.C.,* 10th Dist. No. 21AP-651, 2024-Ohio-1670, ¶ 30. " 'Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis.' " *R.J.C.* at ¶ 30, quoting *State v. Walker,* 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43. " '[W]eight of the evidence' concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather

than the other." *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, quoting *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1977), citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court must consider the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in addressing conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Stewart* at ¶ 23, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 17} A reviewing court should afford the jury's determination great deference as they were "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." (Internal citations omitted.) *Stewart* at ¶ 25. The manifest weight standard is difficult to overcome as the resolution of factual issues resides with the trier of fact, which has the authority to " 'believe or disbelieve any witness or accept part of what a witness says and reject the rest.' " *R.J.C.* at ¶ 32, quoting *State v. Antill*, 176 Ohio St. 61, 67 (1964); *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Reversal of a jury's verdict as being against the manifest weight of the evidence is reserved only for the most exceptional cases in which the evidence weighs heavily against a conviction and requires the unanimous concurrence of all three appellate judges reviewing the case. *Stewart* at ¶ 24; Ohio Constitution, Article IV, Section 3(B)(3).

{¶ 18} In order to demonstrate aggravated menacing, the state must show that Thomas "knowingly cause[d] another to believe that [he would] cause serious physical harm to the person or property of the other person * * * or a member of the other person's immediate family." R.C. 2903.21(A). The General Assembly has provided that an individual acts knowingly, regardless of purpose, "when the person is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 19} Thomas concedes that it is "undisputed that the testimony adduced at trial, specifically that [C.K.] believed her husband was scared, was *sufficient* to support Appellant's conviction." (Emphasis sic.) (Appellant's Brief at 15.) However, Thomas contends that based on the video evidence and attendant circumstances, no reasonable finder of fact could have found her opinion testimony credible. Thomas alternatively argues that even if C.K.'s opinion testimony as to J.K.'s state of mind was credible, "the greater weight of the evidence demonstrated that [Thomas] did not knowingly cause [J.K.] to believe that [he] would cause him serious physical harm." (Appellant's Brief at 16.) Thomas contends that while he intended to scare J.K. and initiated the confrontation for that purpose, he did not succeed as the evidence did not show "his conduct during that confrontation naturally and foreseeably lead [J.K.] to believe that [Thomas] would cause him serious physical harm, nor does it support a finding that [Thomas] was aware that his conduct would create that belief." (Appellant's Brief at 17.) Thomas reasons that the act of walking up to someone while holding a "visibly unloaded" firearm is lawful, and he did not point the rifle, or make any verbal threats, towards J.K. or C.K. (Appellant's Brief at 17.)

{¶ 20} Ohio courts have found that the offense of aggravated menacing does not require the state to demonstrate the " 'offender is able to carry out his threat or that he intends to carry it out or believes himself capable of carrying it out,' nor does it 'require proof that the offender threatened *imminent* serious physical harm.' " (Emphasis sic.) *State v. March-Natali*, 11th Dist. No. 2022-T-0022, 2022-Ohio-4061, ¶ 37, quoting *State v. McDonald*, 11th Dist. No. 2018-A-0008, 2018-Ohio-3845, ¶ 34. The state is required to demonstrate that the victim's subjective belief is that the defendant will cause serious physical harm. *McDonald* at ¶ 34, citing *State v. Gardner*, 8th Dist. No. 104677, 2017-Ohio-7241, ¶ 21; *State v. Perkins*, 8th Dist. No. 86685, 2006-Ohio-3678, ¶ 14. "[A] person can be convicted of aggravated menacing even though the person has not made any movement toward carrying out the threat." (Further citation omitted.) *March-Natali* at ¶ 37.

{¶ 21} This court has previously found that brandishing a firearm is sufficient to support a conviction for aggravated menacing. *State v. Bunsie,* 10th Dist. No. 96APA04-427, 1996 Ohio App. LEXIS 3536, *20 (10th Dist.1996) ("the brandishing of a firearm is sufficient to justify a conviction for the offense of aggravated menacing, a misdemeanor of

the first degree"). Ohio courts have defined "brandish" to mean "wave or exhibit in a menacing or challenging manner." *State v. McCrary*, 1st Dist. No. C-08060, 2009-Ohio-4390, ¶ 30; *see also State v. Hills*, 8th Dist. No. 98848, 2013-Ohio-2902, ¶ 16 (finding defendant's conduct supported a conviction of aggravated menacing when he called the victim a "snitch," removed his firearm from the waistband, and "waved it about in a menacing manner").

{¶ 22} Moreover, Ohio courts have even found that under certain sets of facts, merely revealing the possession of a firearm, even without a direct or explicit threat, could be sufficient to sustain an aggravated menacing conviction. *State v. Goodwin*, 10th Dist. No. 05AP-267, 2006-Ohio-66, ¶ 25, 31 (finding sufficient evidence to support a conviction for aggravated menacing when the defendant knocked on the victim's door and "[t]hen, without talking, appellant lifted his shirt, revealing a firearm, and then he left"); *State v. El-Hardan*, 2d Dist. No. 24293, 2011-Ohio-4453, ¶ 43 ("merely displaying a weapon is enough to support a conviction for Aggravated Menacing when this act causes the victim to believe that the defendant will cause him serious physical harm"). A threat need not be verbal but may be implied by the offender's behavior. *State v. Taylor*, 2d Dist. No. 2018-CA-9, 2019-Ohio-142, ¶ 83, citing *El-Hardan* at ¶ 46, citing *State v. Terzo*, 12th Dist. No. CA2002-08-194, 2003-Ohio-5983, ¶ 18; *see also March-Natali* at ¶ 37-39; *State v. Yoder*, 6th Dist. No. E-19-031, 2020-Ohio-4546, ¶ 16 ("appellant [was] really intimidating, shaking, staring, angry, red-faced, and looming over them with a gun in his waist").

{¶ 23} In the case sub judice, there is no dispute that Thomas intended to put J.K. in a place of fear. Thomas concedes that he left his house to "scare" J.K. and "initiated a confrontation for that purpose." (Appellant's Brief at 17.) C.K. testified that when Thomas approached their vehicle, he was attempting to load a magazine into the gun. (Tr. Vol. I at 34.) C.K. testified that J.K. was "[a]bsolutely" in fear for his safety. (Tr. Vol. I at 76.) While Thomas contends that he did not point the firearm at either J.K. or C.K., Penn testified Thomas approached the couple with the firearm at his side then "confronted them with [the gun]. It was up." (Tr. Vol. II at 52.) In response to Thomas' actions, C.K. testified that J.K. attempted to disarm him by slapping the magazine out of Thomas' hands. (Tr. Vol. II at 34.)

{¶ 24} While Thomas contends that the video evidence does not support C.K.'s testimony that Thomas was loading the rifle as he approached or that he pointed the rifle at J.K., our review of the video is far less definitive. While the video shows Thomas carrying the rifle at his side during the immediate approach, it is difficult to discern whether Thomas attempted to load the rifle or raised it at any point. The video is grainy, and the latter portion of the interaction is partially obstructed by a vehicle and a tree. Concerning whether J.K. believed that Thomas would cause him serious physical harm, we have some evidence from the trial to support C.K.'s testimony. First, Worley testified that the rifle was potentially operable despite the lack of a magazine. There is also the prior history between J.K. and Thomas to consider. Most notably, C.K. testified that Thomas had previously confronted J.K. on Thanksgiving for turning his vehicle around in Thomas' driveway. (Tr. Vol. I at 25, 28-29.) C.K. agreed with the characterization that Thomas had approached J.K. in a "provocative way." (Tr. Vol. I at 26.) Finally, C.K. testified that J.K. attempted to disarm Thomas by slapping the magazine out of his hands. Based on J.K.'s prior history and efforts to disarm Thomas, we can reasonably infer from J.K.'s actions that he was placed in enough fear from Thomas' possession of the gun that he needed to defend himself.

{¶ 25} We conclude that it is appropriate to defer to the jury's determination regarding the witnesses' credibility. While the record reveals some inconsistencies or discrepancies, C.K. testified that J.K. was placed in fear for his safety. As there is some evidence to support C.K.'s testimony, we conclude that the jury did not lose its way in resolving the credibility determinations, nor did the conviction create a manifest miscarriage of justice. Here, the jury could have reasonably concluded that J.K. believed that Thomas would knowingly cause him serious physical harm.

{¶ 26} Thomas relies on *State v. Hamm*, 1st Dist. No. C-190562, 2020-Ohio-4691 and *State v. Fields*, 84 Ohio App.3d 423 (12th Dist.1992) in support of his manifest weight argument. A brief review of these cases is instructive.

{¶ 27} In *Hamm*, the alleged victim in the case, Andrews, walked past a pickup truck outside an ATM machine. *Id.* at ¶ 3. Andrews overheard Hamm make a comment to the other individual in the truck and a verbal exchange ensued. *Id.* at ¶ 3-4. At the start of the exchange, Hamm had a firearm holstered on his hip. *Id.* at ¶ 3. Upon Andrews remarking that Hamm "was acting tough because he had a gun," Hamm removed the gun and handed

it to the passenger in the truck. *Id.* at ¶ 4. Video evidence revealed that "Andrews walked toward the truck, and when Hamm turned toward Andrews, Andrews lunged at him. Hamm was standing with his arms at his side with his right palm down and his left hand holding his cell phone. Andrews immediately assumed a fighting stance and punched Hamm in the face." *Id.* at ¶ 10. Andrews acknowledged, "Hamm did not say anything to provoke the punches." *Id.* at ¶ 5. When Hamm stood up and leaned into the passenger window of his truck, Andrews ran away. *Id.* at ¶ 10. The video evidence showed "Hamm retrieved the holstered gun, clipped it onto his waistband, and pulled his shirt over the holster. He walked unsteadily in the same direction that Andrews had run. Seconds later, Hamm returned to his truck and sat down in the driver's seat. He remained in the truck until the police arrived." *Id.* at ¶ 10. Andrews ultimately ran into the store and an employee called the police. *Id.* at ¶ 6. The trial court found Hamm guilty of aggravated menacing. The First District Court of Appeals reversed finding there was insufficient evidence as Hamm was "lawfully carrying a firearm in a holster strapped to his hip * * * did not brandish the firearm, wave the firearm in the air, * * * threaten to use the firearm[, and] made no threat which would cause a fear of serious physical harm." (Internal quotation omitted.) *Id.* at ¶ 25.

{¶ 28} In *Fields*, an off-duty police officer discovered three boys fishing on the property where she boarded her horses. *Fields* at 428. Fields retrieved her gun and ejected the boys for trespassing. *Id.* While Fields purported waved her gun, she held the gun at her side for the rest of the encounter and "made no threat which would cause a fear of serious physical harm." *Id.* at 428. In fact, the teenagers testified that the appellant was "pretty nice" to them for most of the encounter. *Id.* While Fields was initially convicted of aggravated menacing, the Twelfth District Court of Appeals reversed finding the judgment was against the manifest weight of the evidence as "[t]he boys were trespassers, and under her indicia of authority appellant was entitled to eject them from the property." *Id.* The *Fields* court noted that the property had been vandalized in the past and as a trained police officer, she responded to the situation with "a technique which was cautious and understandable." *Id.*

{¶ 29} There are several unique characteristics about this case that distinguish it from *Hamm* and *Fields*. Unlike defendants in *Hamm* and *Fields*, we know Thomas' initial

intent was to use the rifle to "scare" J.K. Unlike Fields, who discovered multiple trespassers on private property, or Hamm, who was lawfully carrying the firearm before his interaction with Andrews, Thomas obtained his rifle and initiated the confrontation with J.K. based on his belief, real or not, that J.K. had damaged his property. We cannot look at this event in isolation. Unlike *Hamm* and *Fields*, which were interactions with strangers, Thomas and J.K. have a rather tumultuous history. Moreover, unlike *Hamm* and *Field*s, there was testimony in this case that compounded Thomas' implicit threat of violence when he loaded the rifle and "confronted them with [the gun]. It was up." (Tr. Vol. II at 52.). There is no doubt that Ohio law permits walking down the street and openly carrying a firearm. *See e.g., State v. Massingill*, 8th Dist. No. 109818, 2021-Ohio-2674, ¶ 15. However, given Thomas' admitted intent to "scare" J.K., the history of disagreement between the parties, and Thomas' initiation of the confrontation by walking up while loading the gun, Thomas exceeded the bounds of merely exercising his Second Amendment rights. Thus, we are not persuaded by *Hamm* and *Fields* as the factual differences between the cases are far too pronounced.

{¶ 30} Accordingly, having reviewed the record in its entirety, and in light of the evidence discussed above, we conclude the jury did not clearly lose its way by finding Thomas guilty of one count of aggravated menacing, a misdemeanor of the first degree, in violation of R.C. 2903.21.

{¶ 31} Thomas' first assignment of error is overruled.

**B. Thomas' Second Assignment of Error**

{¶ 32} Thomas next challenges whether the trial court's imposition of two-year period of house arrest, at his own expense, and authorizing unrestricted residential searches for weapons violates his right against cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and Article I, Section 9 in the Ohio Constitution.

{¶ 33} The Eighth Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment, provides "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment protects against torture or barbaric punishments as well as punishments that are found to be disproportionate to the crimes committed. *State v.*

*Watkins*, 10th Dist. No. 13AP-133, 2018-Ohio-5137, ¶ 10. The Supreme Court of Ohio has noted that the protection against disproportionate punishments is a "central substantive guarantee of the Eighth Amendment." (Internal citations omitted.) *State v. Moore,* 149 Ohio St.3d 557, 2016-Ohio-8288, ¶ 31. To be sure, the Eighth Amendment does not require strict proportionality between the sentence and crime but forbids extreme sentences that would be considered "grossly disproportionate." *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, ¶ 13. Punishments that are prohibited by the Eighth Amendment on proportionality grounds are ones that are " 'so disproportionate to the offense as to shock the moral sense of the community.' " *State v. Fraley*, 12th Dist. No. CA2021-10-131, 2022-Ohio-3270, ¶ 28, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69 (1964). " ' "[C]ases in which cruel and unusual punishments have been found are limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person." ' " *State v. Treadwell*, 10th Dist. No. 19AP-304, 2020 Ohio App. LEXIS 1699, *10 (Apr. 30, 2020), quoting *State v. Weitbrecht*, 86 Ohio St.3d. 368, 371 (1999), quoting *McDougle* at 70.

{¶ 34} As an initial matter, we note the trial court's judgment entry indicates that it considered the factors for felony sentencing under R.C. 2929.12 instead of the R.C. 2929.22 factors for misdemeanor sentencing. (*See* Dec. 29, 2022 Jgmt. Entry ("considered all matters required by Sections 2929.12 and 2951.02 of the Revised Code").) Given the trial court's consideration of other misdemeanor factors in the sentencing entry, we conclude this discrepancy in the entry amounts to a clerical error. Thomas also acknowledges this typographical error is immaterial writing, "[n]evertheless, the trial court's reliance on R.C. 2929.12, whether an actual error or merely a typographical mistake, is irrelevant to Appellant's Second Assignment of Error." (Reply Brief of Appellant at 12.) As such, we will focus our analysis on the three aspects of Thomas' sentence: (1) the two-years of home confinement, (2) the imposition of $2,226.50 in costs for the house arrest[2], (3) subjecting his residence to search at any time for weapons.

---

[2] As noted by the state, Thomas' contention that the costs of house arrest are $3.05 per day, which, over the course of two years, would total $2,226.50 is not documented in the record. In any case, as we will discuss below, even if the figure is correct, the outcome of our analysis remains the same as such costs would not amount to a violation of Thomas' Eighth Amendment rights.

**1. House Arrest.**

{¶ 35} Thomas contends the trial court's sentence violates his Eighth Amendment rights as the "two-year period of house arrest imposed in this case—at his own expense—is shocking to any reasonable person, and grossly disproportionate to any other sentence imposed for similar conduct in Franklin County." (Appellant's Brief at 21.) Thomas argues that the two-year period of home confinement is four times longer than any jail term authorized by law. Thomas argues that the trial court's lack of discussion of the statutory factors at sentencing underscores the unreasonableness and disproportionality of the sentence. (Appellant's Brief at 23.)

{¶ 36} The General Assembly explained the dual purposes of misdemeanor sentencing as "[p]rotect[ing] the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." R.C. 2929.21(A). Unless statutory directed otherwise, the trial court "may sentence an offender to jail term, community control sanctions, or both." *State v. Blankenship*, 192 Ohio App.3d 639, 2011-Ohio-1601, ¶ 6 (10th Dist.), citing R.C. 2929.25(A)(1). Community control sanctions may be residential under R.C. 2929.26, nonresidential under R.C. 2929.27, or financial under R.C. 2929.28. R.C. 2929.25(A)(1)(b). The duration of all community control sanctions imposed for a misdemeanor offense shall not exceed five years. R.C. 2929.25(A)(2).

{¶ 37} We find that Thomas' sentence of two years of house arrest was not excessive or so disproportionate as to violate the Eighth Amendment prohibitions against cruel and unusual punishment. We acknowledge that R.C. 2929.26(A)(1) provides that community residential sanctions of confinement to a halfway house or community-based correctional facility cannot exceed the longest jail term available under the offense. House arrest, however, is classified as a nonresidential sanction and is not limited to the jail term available for the offense. R.C. 2929.27(A). *See Blankenship* at ¶ 17 ("a trial court has discretion to impose a term of [electronically monitored house arrest] longer than the maximum jail term available for the offense, so long as the court heeds the cumulative five-year restriction for all community control sanctions"); *State v. Pope*, 9th Dist. No.

13CA0031-M, 2014-Ohio-2864, ¶ 12, citing *State v Cowen*, 167 Ohio App.3d 233, 2006-Ohio-3191, ¶ 27 (2d. Dist.) ("If the legislature intended for a sentence of [house arrest] to be the equivalent of a jail term, then it could have inserted the same limitation in R.C. 2929.27, but it did not."). As for proportionality, the two-year period of home confinement falls squarely within the scope of permissible statutory sentences. While not absolute, this court has typically found that a sentence that falls within the scope of a valid sentencing statute does not constitute cruel and unusual punishment. *Treadwell* at *10, citing *Hairston* at ¶ 21, quoting *McDougle* at 69. Under the facts of this particular case, we see no reason to deviate from this general principle.

**{¶ 38}** Thomas also takes issue with the alleged lack of meaningful discussion of various statutory factors. However, this court has previously stated that while the trial court must consider the factors under R.C. 2929.22, it is not required to set forth its reasoning for imposing sentencing on the record. *State v. Wood*, 10th Dist. No. 15AP-615, 2016-Ohio-1239, ¶ 10; *State v. Hall*, 2d Dist. No. 24753, 2012-Ohio-1571, ¶ 18 ("a trial court is not required to discuss the considerations listed in R.C. 2929.22 on the record, or make explicit findings to support the sentence").

**{¶ 39}** As the trial court's imposition of two years of house arrest falls within the scope of permissible sentences and was not " 'so disproportionate to the offense as to shock the moral sense of the community,' " *Fraley* at ¶ 28, quoting *McDougle* at 69, we cannot find that the trial court violated Thomas' Eighth Amendment right against cruel and unusual punishment.

### 2. Costs of House Arrest.

**{¶ 40}** We next examine Thomas' contention that the imposition of the costs of the two-year period of house arrest, purportedly totaling $2,260, amounts to an Eighth Amendment violation. (Appellant's Brief at 21.)

**{¶ 41}** R.C. 2947.23(A)(1)(a) directs that in all criminal cases, the trial court must include in the sentence the costs of prosecution and render a judgment against the defendant for those costs. Furthermore, R.C. 2929.28(A) permits the trial court, when imposing a misdemeanor sentence on an offender, to "sentence the offender to any financial sanction or combination of financial sanctions authorized under [R.C. 2929.28]." Financial sanctions include a fine of no more than $1,000 for a misdemeanor of the first

degree, and reimbursement of "any or all of the costs of sanctions incurred by the government," which includes "[a]ll or part of the costs of implementing any community control sanction, including a supervision fee under section 2951.021, and costs of global positioning system device monitoring." R.C. 2929.28(A)(3)(a)(i).

{¶ 42} Based on the above statutory language, we disagree with the contention that the costs of house arrest cannot exceed the financial penalty of $1,000 or that such costs amount to an Eighth Amendment violation.

### 3. Thomas' house is subject to search at any time for weapons.

{¶ 43} Thomas argues the trial court violated his Eighth Amendment rights by not clearly considering the specific provisions under R.C. 2951.02 and 2929.22 as it imposed an unlawful condition with respect to Thomas' community control subjecting his home "to search by Probation or law enforcement at any time for weapons." (Appellant's Brief at 22, citing Jgmt. Entry at 2.)

{¶ 44} Preliminarily, we note that Thomas' argument is more aptly characterized as a statutory violation and not an Eighth Amendment issue. The state contends that because Thomas failed to raise any statutory objections in the trial court or expressly assert a statutory issue in the second assignment of error, the statutory arguments should be considered waived. (State's Brief at 19.)

{¶ 45} Regardless of whether Thomas expressly raised the statutory issue as a separate assignment of error, appellate courts have discretionary authority to "recognize '[p]lain errors or defects affecting substantial rights' although they were not raised to the trial court." *State v. Collins*, 10th Dist. No. 17AP-703, 2018-Ohio-2606, ¶ 8, quoting Crim.R. 52(B); *Columbus v. Asomani*, 10th Dist. No. 16AP-255, 2017-Ohio-812, ¶ 16; *State v. Wharton*, 4th Dist. No. 15CA9, 2015-Ohio-5026, ¶ 31 (concluding that reviewing courts have the "discretion to sua sponte notice plain error"). This court will only recognize plain error under exceptional circumstances, with the utmost caution, and only to prevent a miscarriage of justice. *State v. People*, 10th Dist. No. 21AP-45, 2022-Ohio-953, ¶ 22, citing *State v. C.D.S.*, 10th Dist. No. 20AP-355, 2021-Ohio-4492, ¶ 36, citing *State v. Collins*, 10th Dist. No. 20AP-119, 2021-Ohio-1663, ¶ 11.

{¶ 46} As acknowledged by Thomas, R.C. 2951.02 provides for the warrantless search of a misdemeanor offender's residence. However, R.C. 2951.02 only allows

probation officers to search an offender's residence if there are "reasonable grounds to believe the offender is not abiding by the law or otherwise not complying with the conditions of the misdemeanor offender's community control sanction."    R.C. 2951.02(A)(1)(a).  As conceded by the state, "R.C. 2951.02(A) does not include the statutory authority to search a misdemeanor offender's home at any time for weapons." (State's Brief at 38.)

{¶ 47} While the state acknowledges R.C. 2951.02(A) does not grant probation officers the statutory authority to search a misdemeanor offender's home at any time for weapons, it argues R.C. 2929.27(C) allows the trial court to "impose any other sanction that is intended to discourage the offender * * * from committing a similar offense if the sanction is reasonably related to the overriding purposes and principles of misdemeanor sentencing." (State's Brief at 38.)  The Supreme Court set out the relevant test in *State v. Jones*, 49 Ohio St.3d 51, 52 (1990), "which looks to whether a community-control condition reasonably relates to the offense at issue, furthers the twin goals of rehabilitation and justice, and does not cause a greater deprivation of liberty than is necessary to achieve those penological goals."  *State v. Chapman*, 163 Ohio St.3d 290, 2020-Ohio-6730, ¶ 17, citing *Jones* at 53.  When resolving whether a condition of probation complies with R.C. 2929.27(C), a trial court must consider "whether the condition (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation."  *Jones* at 53.  All three conditions must be met for the reviewing court to find that the trial court did err.  *State v. Cintron*, 8th Dist. No. 110600, 2022-Ohio-305, ¶ 21, citing *Solon v. Broderick*, 8th Dist. No. 107043, 2018-Ohio-4900, ¶ 8.  Moreover, the condition "cannot be overly broad so as to unnecessarily impinge upon the probationer's liberty."  *State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, ¶ 13, quoting *Jones* at 52.

{¶ 48} Upon careful consideration, while the unlimited search of Thomas' home for weapons has some relationship to the crime to which he was convicted, as constructed, the condition is not reasonably related to rehabilitating Thomas, nor does it serve the statutory ends of probation.  Furthermore, the condition is so overly broad that it would invariably impinge upon his liberty.  At base, we cannot reconcile, under the facts of the case, how

imposing a community control condition that excludes the "reasonable grounds" requirement of R.C. 2951.02 would constitute a permissible sanction under R.C. 2929.27(C). Consequently, we find the state's alternative grounds for affirming the trial court's condition under R.C. 2929.27(C) without merit.

{¶ 49} Thus, we sua sponte find that the trial court committed plain error by subjecting Thomas' home to searches at any time for weapons as it is contrary to the plain terms of R.C. 2951.02(A). As we already have found the unrestricted search provision of Thomas' sentence was contrary to law and amounts to plain error, we decline to also address his Eighth Amendment argument as the issue is moot. Accordingly, Thomas' second assignment of error is overruled in part, sustained in part, and denied as moot in part. Thomas' sentence is vacated, and this matter is remanded to the trial court for resentencing.

### C. Thomas' Third Assignment of Error

{¶ 50} In Thomas' final assignment of error, he contends that the trial court erred by failing to advise him of the mandatory warning contained in R.C. 2929.25(A)(3) rendering the sentence contrary to law.

{¶ 51} Thomas' assignment of error is a question of law as it requires statutory interpretation. While we generally review questions of law de novo, *e.g.*, *Wayt v. DHSC, L.L.C.*, 155 Ohio St.3d 401, 2018-Ohio-4822, ¶ 15, as Thomas failed to preserve or object to this issue at the trial court level, we review this question for plain error.

{¶ 52} R.C. 2929.25 sets forth misdemeanor community control sanctions. *State v. J.M.S.*, 10th Dist. No. 18AP-772, 2019-Ohio-3383, ¶ 13. R.C. 2929.25(A)(1) provides that the trial court may sentence an offender, except as provided in sections 2929.22 and 2929.23 of the Revised Code or when a jail term is required by law, convicted of a misdemeanor, other than a minor misdemeanor, in two distinct ways:

> (a) Directly impose a sentence that consists of one or more community control sanctions authorized by section 2929.26, 2929.27, or 2929.28 of the Revised Code. The court may impose any other conditions of release under a community control sanction that the court considers appropriate. If the court imposes a jail term upon the offender, the court may impose any community control sanction or combination of community control sanctions in addition to the jail term.

(b) Impose a jail term under section 2929.24 of the Revised Code from the range of jail terms authorized under that section for the offense, suspend all or a portion of the jail term imposed, and place the offender under a community control sanction or combination of community control sanctions authorized under section 2929.26, 2929.27, or 2929.28 of the Revised Code.

{¶ 53} Stated another way, "R.C. 2929.25 provides a trial court two options when sentencing an offender to community control, either (1) impose a sentence of community control, or (2) impose a jail term and suspend some or all of that sentence and place the offender on community control. R.C. 2929.25(A)(1)(a) and (b)." *J.M.S.* at ¶ 13.

{¶ 54} In the first scenario, R.C. 2929.25(A)(3) directs the trial court as follows:

At sentencing, if a court directly imposes a community control sanction or combination of community control sanctions pursuant to division (A)(1)(a) or (B) of this section, the court shall state the duration of the community control sanctions imposed and shall notify the offender that if any of the conditions of the community control sanctions are violated the court may do any of the following:

(a) Impose a longer time under the same community control sanction if the total time under all of the offender's community control sanctions does not exceed the five-year limit specified in division (A)(2) of this section;

(b) Impose a more restrictive community control sanction under section 2929.26, 2929.27, or 2929.28 of the Revised Code, but the court is not required to impose any particular sanction or sanctions;

(c) Impose a definite jail term from the range of jail terms authorized for the offense under section 2929.24 of the Revised Code.

{¶ 55} While Thomas is correct that R.C. 2929.25(A)(3) requires a court to provide certain notifications, that is only mandatory if the court directly imposes community control under R.C 2929.25(A)(1)(a). If the trial court imposes a suspended jail sentence with community control sanctions, as allowed under R.C. 2929.25(A)(1)(b), the statutory notifications are not required. The Second District Court of Appeals has aptly explained the rationale:

This is logical, because if the court has already chosen the alternative in R.C. 2929.25(A)(1)(b) of imposing a definite term and suspending all or part of the term, the court would not need to impose a definite term if the offender violates the community control sanctions -- a definite term has already been imposed. As a sanction for the violation, the court could simply require the offender to serve all or part of the definite term that had been suspended.

*State v. Drake*, 2d Dist. No. 21939, 2007-Ohio-6586, ¶ 22.

**{¶ 56}** Our conclusion aligns with other Ohio appellate courts that have reviewed the same statute provisions. *See, e.g., State v. Snell*, 2d. No. 2018-CA-99, 2019-Ohio-2251, ¶ 9, citing *Drake* at ¶ 22; *State v. Everson*, 6th Dist. No. L-17-1138, 2018-Ohio-323, ¶ 24-26; *State v. Lucas*, 4th Dist. No. 16CA7, 2017-Ohio-7663, ¶ 9; *State v. Begley,* 12th Dist. No. CA2015-01-005, 2015-Ohio-2892, ¶ 10; *State v. Russell*, 7th Dist. No. 09 MA 156, 2011-Ohio-1181, ¶ 27-28.

**{¶ 57}** Here, the trial court imposed a sentence of 180 days in jail with 174 days suspended. Thomas received six days of jail-time credit. The trial court then imposed a five-year term of intensive supervision. Because the sentence was pursuant to (A)(1)(b), the notifications requirements of (A)(3) were not applicable, and trial court was not required to notify Thomas of the consequences of violating community control in (A)(3)(a) through (c). While the trial court agreed with the state's comments that it "would expect strict compliance" and "would ask Thomas go to jail for any violation" of the terms of community control, any type of notification does not move the type of sentence from (A)(1)(b) to (A)(1)(a). (Dec. 15, 2022 Sentencing Tr. at 20.)

**{¶ 58}** In the interest of clarity, however, we must address the language provided in the January 6, 2023 notice of community control, which reads, "Court may impose a more restrictive sanction upon you, if a term of imprisonment is imposed the Court will impose a prison term of five years." (Jan. 6, 2023 Notice.) After a review of the sentencing transcript and judgment entry, it is apparent the above language from the notice contains an obvious clerical error as it provided the length of the community control term, 5 years, in place of the 174-day jail term that could be imposed. Such typographical errors may be corrected by a nunc pro tunc entry, following a limited order of remand. "Clerical errors, including ones involving a court's incorrect statutory reference in a sentencing entry, can be corrected by a nunc pro tunc entry." *State v. Bradford*, 4th Dist. No. 16CA3531, 2017-Ohio-3003, ¶ 23 (collecting cases). A clerical error, however, does not render a conviction or sentence void or contrary to law. *Id.* For the reasons stated in our resolution of the second assignment of error, this case will be remanded for resentencing. Upon resentencing, the trial court is also instructed to correct the clerical error included in the notice of imposition of community control.

{¶ 59} Accordingly, we overrule Thomas' third assignment of error but remand the case to the trial court with instructions.

## IV.  CONCLUSION

{¶ 60} Having overruled in part and sustained in part Thomas' second assignment of error, and overruled his first and third assignments of error, the conviction in this case is affirmed and the matter is remanded for resentencing consistent with the decision.

*Judgment affirmed*;
*sentence affirmed in part and reversed in part*;
*cause remanded.*

JAMISON and EDELSTEIN, JJ., concur.

_____