[Cite as *State v. King*, 2025-Ohio-918.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 23AP-727 |
| v. | : | (C.P.C. No. 22CR-2211) |
| Jermaine C. King, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 18, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Jermaine C. King, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of two counts of murder and one count of having weapons while under disability. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On May 19, 2022, appellant was indicted on one count of aggravated murder (Count 1), one count of murder in violation of R.C. 2903.02, an unclassified felony ("purposeful murder") (Count 2), a second count of murder in violation of R.C. 2903.02, an unclassified felony ("felony murder") (Count 3), and one count of having weapons while under disability, a third-degree felony (Count 4). Each of the murder counts included

three-year firearm specifications under R.C. 2941.145(A). The charges related to the death of Lawrence Jefferson on April 26, 2022.

{¶ 3} Prior to trial, appellant pled guilty to the charge of having weapons under disability (Count 4). The remaining charges came for trial before a jury in August 2023. Plaintiff-appellee, the State of Ohio, presented the following evidence.

{¶ 4} Strowther Davis, III, testified that, on April 26, 2022, he and the victim, Jefferson, were working at a barbershop. The barbershop was at the bottom of a stairwell accessed from a door at street level. While Davis attended to a walk-in customer, another individual he did not recognize came into the shop and talked to Jefferson. After about 20 to 30 seconds, that individual and Jefferson left the shop and headed up the stairwell. Davis testified that he heard two gunshots in quick succession about 10 to 12 seconds after the individual and Jefferson left. He looked up to see Jefferson fall to the floor and, when he tried to locate the other individual, the door was closing, and that person was gone. Davis then ran upstairs to a store located there, the Sunshine Food Mart and Smoke Shop, and asked them to call 911.

{¶ 5} Detective Thomas Burton testified that Jefferson was already deceased when he arrived at the scene. Police recovered two spent shell casings and a spent bullet projectile from the stairwell. Police also recovered Jefferson's cell phone. An autopsy report later determined that Jefferson had two gunshot wounds—the first to his forehead which was determined to have been fatal, and a second to his abdomen.

{¶ 6} Detective Terrence Kelley testified that, when he arrived on the scene, he learned there was surveillance video from a camera at the Sunshine Food Mart and Smoke Shop that showed a potential suspect. The potential suspect in that video matched the physical description of the suspect that Davis had provided to police at the scene. The video showed the individual walking into the barbershop door at street level and then exiting the same door a minute or two later, first walking away from the barbershop down the sidewalk and into an alley, then running through the alley to the rear of a nearby apartment complex. Video from the apartment complex showed the potential suspect accessing a white 2010 GMC Yukon.

{¶ 7} Detective Kelley testified they were able to identify appellant as the potential suspect from tips received on the suspect's photograph, which police had obtained from the

surveillance video and posted on social media, and from details about the Yukon which police ultimately determined belonged to appellant's girlfriend. At trial, appellant's girlfriend proffered stipulated testimony that, when questioned by police in May 2022, she had positively identified appellant as the individual seen in the surveillance video and that appellant had access to the Yukon on the day of the shooting.

{¶ 8} On cross-examination, Detective Kelley testified that Jefferson was under investigation by the United States Drug Enforcement Administration for trafficking narcotics. He also testified that Jefferson's girlfriend was reportedly concerned about his drug-dealing activities. A toxicology report indicated that Jefferson had cocaine in his system and that he would have been under the drug's effects at the time of his death.

{¶ 9} Appellant testified on his own behalf. He believed Jefferson had sold drugs to his girlfriend's mother, whom he referred to as his "mother-in-law." (Tr. Vol. 2 at 345.) He observed the transaction while he was a customer at a barbershop at which Jefferson worked.

{¶ 10} Sometime after that observation, around September or October 2021, appellant obtained Jefferson's phone number. Appellant said his girlfriend's mother had a non-fatal overdose episode in November 2021. On December 29, 2021, appellant texted Jefferson to "reel him in" and make him believe he was interested in buying drugs from him. (Tr. Vol. 2 at 344.) Jefferson did not respond.

{¶ 11} On February 19, 2022, appellant's girlfriend's mother died from a fentanyl and oxycodone overdose.

{¶ 12} Appellant eventually learned that Jefferson was working at a different barbershop. A couple weeks after learning that detail, on April 26, 2022, appellant decided to visit Jefferson at Jefferson's new workplace to confront him about his girlfriend's mother, to find out when he last had contact with her, and because he wanted "closure." (Tr. Vol. 2 at 348.) Appellant testified that he took a gun with him because Jefferson was "very intimidating." (Tr. Vol. 2 at 347.) Appellant parked the Yukon at the nearby apartment complex because it was the back route to the barbershop. When he left the vehicle, he put the gun, a 9mm semi-automatic, in his back waistband.

{¶ 13} At the barbershop, appellant and Jefferson talked for a brief second then Jefferson asked him to step outside so their conversation would not be heard by the others

in the shop, Davis, and Davis's customer.  Appellant testified that he walked up the stairs exiting the barbershop first with Jefferson behind him.  Appellant felt the gun being removed from his waist and turned around.  Appellant said he feared for his life and struggled with Jefferson for the weapon.  During the struggle, the weapon discharged. Appellant saw Jefferson fall and panicked.  He then left the barbershop, first walking then running to the Yukon.  Appellant said he did not call 911 because he was traumatized and scared.

{¶ 14} The next day, on April 27, 2022, appellant drove to Detroit.  Appellant returned to Columbus two or three days later after conferring with defense counsel in order to turn himself in to police.

{¶ 15} The jury found appellant not guilty of aggravated murder (Count 1), but it returned guilty verdicts on the two murder counts (Counts 2 and 3) and the firearm specifications accompanying those counts.

{¶ 16} In a sentencing entry filed November 9, 2023, the trial court merged Counts 2 and 3 and sentenced appellant to 15 years to life in prison on Count 2.  The court also imposed 36-months in prison on Count 4.  The court ordered the sentences to run concurrently with each other but consecutively to the 3-year prison term imposed on the firearm specification accompanying Count 2 for an aggregate sentence of 18 years to life. Appellant timely appealed.

## II.  Assignments of Error

{¶ 17} Appellant appeals and assigns the following two assignments of error for our review:

> I. The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of murder, as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.
>
> II. The trial court erred to the prejudice of appellant by permitting the state to introduce prejudicial and inadmissible character evidence.

### III. Discussion

{¶ 18} Under the first assignment of error, appellant challenges the sufficiency and weight of the evidence supporting his murder convictions, Counts 2 and 3.

{¶ 19} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Accordingly, we set forth the relevant standards of review for each.

{¶ 20} "[W]hether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial." *State v. Harris*, 2023-Ohio-3994, ¶ 14 (10th Dist.), citing *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.); *Thompkins* at 386. In a sufficiency challenge, an appellate court does not weigh the evidence; rather, the court determines " ' "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *Harris* at ¶ 14, quoting *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A reviewing court "essentially assume[s] the state's witnesses testified truthfully and determine[s] if that testimony and any other evidence presented at trial satisfies each element of the crime." *Harris* at ¶ 14, citing *State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), citing *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Thus, evidence is sufficient to support a conviction where, if believed, that evidence would permit any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Harris* at ¶ 14, citing *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 21} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 45 (1982), citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "To reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." *Thompkins* at paragraph three of the syllabus, applying Ohio Const., art. IV, § 3(B)(3).

{¶ 22} In contrast to a sufficiency challenge, a manifest weight claim "attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion." *Harris* at ¶ 15, citing *State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins*, 78 Ohio St.3d at 386-87. Although the evidence may be sufficient to sustain a guilty verdict, a manifest weight challenge requires a different type of analysis. *Harris* at ¶ 14, citing *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), citing *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 23} When presented with a manifest weight challenge, an appellate court sits as a " 'thirteenth juror' and may disagree 'with the factfinder's resolution of the conflicting testimony.' " *Harris*, 2023-Ohio-3994, at ¶ 16, quoting *Thompkins* at 387, citing *Tibbs* at 42. In making this determination, an appellate court " 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 24} Although an appellate court reviews credibility when assessing the manifest weight of the evidence, the court must be mindful that determinations regarding witness testimony and the weight of testimony are primarily for the trier of fact. *Harris* at ¶ 17, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is so because the trier of fact is best able " 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Harris* at ¶ 17, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 25} " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. Further, reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel

reviewing the case. *Harris* at ¶ 18, citing Ohio Const., art. IV, § 3(B)(3); *State v. Short*, 2024-Ohio-92, ¶ 13 (10th Dist.), citing *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

{¶ 26} Appellant was convicted of purposeful murder pursuant to R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another." Appellant was also convicted of felony murder, pursuant to R.C. 2903.02(B), which provides in part that "[n]o person shall cause the death of another as a proximate result of the offender's committing . . . an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Here, the predicate offense underlying the felony murder charge is felonious assault under R.C. 2903.11(A)(1), which states that "[n]o person shall knowingly . . . [c]ause serious physical harm to another."

{¶ 27} Appellant contends he did not purposefully fire his weapon at Jefferson. Citing his own testimony, appellant avers that the weapon discharged during the struggle with Jefferson and, further, that it was Jefferson's decision to take the weapon from him which led to the ensuing struggle, the discharge of the weapon, and Jefferson's death.

{¶ 28} The state counters that it was reasonable for the jury to not believe appellant's version of events. It also argues that evidence in the case refuted appellant's testimony. In support, the state points to video evidence that showed appellant manipulating something heavy in his front sweatshirt pocket, suggesting that appellant was not carrying the gun in his back waistband as he testified. It also points to appellant's actions in seeking out Jefferson, taking a gun with him to the barbershop, and parking behind the barbershop rather than in the parking lot in front of the building as further evidence of appellant's guilt.

{¶ 29} When viewed in a light most favorable to the state, we find there was sufficient evidence to convict appellant of purposeful murder and of felony murder via felonious assault because the state presented sufficient evidence to establish that Jefferson's death was caused by appellant shooting him with a deadly weapon.

{¶ 30} Appellant also contends his convictions on Counts 2 and 3 were against the manifest weight of the evidence for the same grounds raised in his sufficiency argument. Again, the crux of appellant's argument is that the jury should have believed his testimony about what happened in the stairwell with Jefferson.

{¶ 31} A conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the appellant's version. *State v. Gale*, 2006-Ohio-1523, ¶ 19 (10th Dist.). The trier of fact is free to believe or disbelieve all or any of the testimony provided at trial. *State v. Jackson*, 2002-Ohio-1257 (10th Dist.).

{¶ 32} Appellant does not dispute that Jefferson was killed by gunshots from the gun he had on his person at the barbershop. The only dispute is whether appellant purposefully or knowingly discharged the weapon. It was within the province of the jury to assess appellant's credibility to determine whether it credited his version of the incident or instead believed the state's version of events. After review of the entire record and the relevant evidence, including all reasonable inferences and the credibility of the witnesses, we cannot say that the jury clearly lost its way or that a manifest miscarriage of justice has occurred.

{¶ 33} Based on the foregoing, we conclude the state presented sufficient evidence to support appellant's convictions on Counts 2 and 3, and that those convictions were supported by the manifest weight of the evidence. Accordingly, appellant's first assignment of error is overruled.

{¶ 34} In his second assignment of error, appellant challenges the state's introduction of evidence regarding his involvement in a rap music production business as inadmissible and prejudicial character evidence.

{¶ 35} During the state's cross-examination of appellant, the prosecutor sought to introduce as evidence a business card that was found during the execution of a search warrant at appellant's girlfriend's residence. Following a sidebar to discuss defense counsel's objection, the trial court decided to permit the evidence because "how [appellant] puts himself out in the public is relevant in this case." (Tr. Vol. 2 at 374.)

{¶ 36} The state then introduced the business card after the following exchange with appellant:

Q: We were talking earlier - - you aren't just a guy who works in construction; you have other businesses, too, right?

A: Yes.

Q: And it's not just interior decorating either, right?

A: Right.

Q: You also have a production company?

A: Yes.

(Tr. Vol. 2 at 375.)

{¶ 37} The prosecutor admitted the business card as an exhibit and continued:

Q: It's your business card?

A: Yes.

Q: Your production company is called Murda Style Music?

A: Yes.

Q: And you actually have a rap name yourself, right?

A: Yes, stage name.

Q: Maineyac Killah.

A: Maineyac.

(Tr. Vol. 2 at 375-76.)

{¶ 38} On re-direct examination, appellant testified the card was created in 2008 for the music production company and the business name referred to the type of rap music the business produced. Appellant explained that his stage name, "Maineyac Killah," was a play on his childhood name.

{¶ 39} During closing argument, the state explained to the jury its use of the evidence as follows: "This wasn't being brought into evidence in any way to suggest that this is a confession to murder. I want to be very clear about that, in no way am I suggesting his rapper alias or his production company name suggests that he's more likely to be guilty of murder in this case." (Tr. Vol. 3 at 415.) The state explained: "But what it does tell us, folks, if you turn on a radio station in your car, like, I'm talking top 100 pop hits, you're going to hear - - you're going to hear some sort of reference to an automatic weapon, and you'll hear the sound of an automatic weapon incorporated into a song. This is very much a common experience." (Tr. Vol. 3 at 415-16.) The state went on, "How is it that a man who works at a production company has no idea about that? Folks, he knows - - he knows what

an automatic weapon is, he knows what a semiautomatic weapon is." (Tr. Vol. 3 at 416.) The state suggested to the jury that appellant's purported dishonesty was to cover for having pulled the gun's trigger twice to shoot Jefferson.

{¶ 40} Appellant contends the state introduced the business card for the purpose of impermissibly impugning his character. He argues that, because he had not offered evidence of his own good character, the door was not open to the state to introduce evidence of his alleged bad character. He contends the evidence was highly prejudicial and led the jury to conclude he was a "violent and murderous person." (Appellant's Brief at 7.)

{¶ 41} The state counters that the evidence was used "primarily as impeachment, nonetheless, it was not impermissible character evidence." (Appellee's Brief at 15.) The state argues that the evidence was not a suggestion of appellant's guilt, as it reminded the jury during closing argument, but was instead offered to refute appellant's claims that he was unfamiliar with weapons. Lastly, the state argues that, even if the trial court erred in allowing the evidence, the error was harmless given ample other evidence to support the convictions.

{¶ 42} The threshold question to determine admissibility is whether the evidence is relevant. *State v. Hartman*, 2020-Ohio-4440, ¶ 24; *see also* Evid.R. 402 ("Evidence which is not relevant is not admissible."). Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." But relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Because an admissibility decision involves an exercise of the trial court's judgment, it is reviewed for an abuse of discretion. *Hartman* at ¶ 31.

{¶ 43} Character evidence is described in Evid.R. 404(A)(1): "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith" except that "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible." In other words, if a defendant offers evidence of his or her good character, the prosecution can offer evidence of the defendant's bad character to rebut that assertion subject to exceptions set forth in the rule.

{¶ 44} The state argues in its brief that it sought to use the business card evidence as follows: "The prosecutor initially indicated she sought to use this information to cast doubt on appellant's claim that he was completely unfamiliar with weapons but appeared to use the testimony to impeach appellant's portrayal of his professional life." (Appellee's Brief at 13.) The state's argument has it in reverse order—the trial court initially allowed the evidence as being relevant to how appellant "puts himself out in the public." But, as described in the state's closing argument, the state ultimately appeared to use the evidence to have the jury infer that appellant was not telling the truth regarding his knowledge of the difference between an automatic and semi-automatic weapon.

{¶ 45} Regarding how appellant puts himself out in public, we do not find the business card evidence, as presented by the state in this case, has probative value on that issue. The evidence revealed that the card was created in 2008, 14 years prior to the date of the murder. The state found appellant's business card while exercising a search warrant at his girlfriend's residence. No testimony was presented regarding how widely the card was distributed, how widely the music production company was known among the public, or how prolific of a production company it is. Nor was there evidence presented regarding the substance of the music produced, except that it was a style of rap music,[1] or whether appellant was widely known in the public by his stage name. On the facts of this case, the existence of a 2008 business card and stage name for a rap music production company, without more, does little to inform the jurors about a person's public persona or what the public might know about a particular individual. Therefore, to address how appellant puts himself out in public, we find the trial court erred in admitting the evidence because the probative value is substantially outweighed by the danger of unfair prejudice.

---

[1] On re-direct examination, appellant's counsel asked him what the name of the business meant. Appellant responded "[i]n the music business in the culture, people have different styles of rap. Some rap fast, some rap slow, some maybe rap rhymie or however you want to call it. We call it Murda Style Music, because we take your style of music, whatever you rap with, and we going to murder you with your own style of music." (Tr. Vol. 3 at 377.)

{¶ 46} Regarding appellant's familiarity with weapons,[2] we do not find appellant's creation of a business card in 2008 for a rap music production company and stage name has any tendency to make his familiarity with weapons more or less probable. Therefore, to address appellant's familiarity with weapons, we find the trial court erred in admitting the evidence as it was not relevant.

{¶ 47} We also find that, contrary to the state's assertion, the evidence was not impeachment of appellant's testimony regarding how he puts himself out in public or regarding his familiarity with guns. Appellant did not dispute that he was involved in more than construction work. And his involvement in rap music, without more, would not make his testimony regarding his knowledge of weapons any more or less credible.

{¶ 48} Finally, we find that the business card evidence was not admissible character evidence under Evid.R. 404(A)(1). The state's suggestion otherwise would require us to infer that appellant's character was discernable from his choice of a business name and stage name made in 2008 for a rap music production company. Again, as noted above, the business card evidence alone, without more, does not appear to be probative of character even if we were to find that appellant had opened the door to testimony regarding his bad character.

{¶ 49} For the foregoing reasons, we conclude the trial court abused its discretion by admitting the business card evidence over defense counsel's objection.

{¶ 50} Because appellant objected to the admission of evidence at trial, we review for harmless error. *See State v. Smith*, 2017-Ohio-9283, ¶ 39 (10th Dist.); *State v. Morris*, 2014-Ohio-5052, ¶ 25. The harmless-error standard is described in Crim.R. 52(A) which states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under this standard, the court must determine whether the defendant was prejudiced by the erroneous admission of evidence with a focus on " 'both the impact of the offending evidence on the verdict and the strength of the remaining

---

[2] When asked on direct examination, appellant stated that he was carrying a 9mm semi-automatic gun when he went to the barbershop. On cross-examination, the state asked appellant if it was fair to say the gun he carried was "not an automatic weapon." Appellant answered "I don't know the difference. It's just a weapon to me." (Tr. Vol. 2 at 364.) The state went on and asked "[s]o you know that for an automatic weapon, if you pull the trigger, it keeps firing off shots, right?" (Tr. Vol. 2 at 364-65.) Appellant answered, "I don't know." (Tr. Vol. 2 at 365.) The state also asked appellant if he had "no idea what the weapon that you were in possession that day if you had to pull the trigger once or if you held it to fire off multiple rounds?" Appellant answered "[n]o, I'm not aware of that at all." (Tr. Vol. 2 at 365.)

evidence after the tainted evidence is removed from the record.' " *Smith* at ¶ 39, quoting *Morris* at ¶ 25.[3]

{¶ 51} We find that the business card evidence had little impact on the verdict. As discussed above regarding the first assignment of error, the jury was free to disbelieve appellant's account of what happened in the stairwell with Jefferson. Because the business card evidence did not bolster the state's theory or contradict appellant's, we find the business card evidence did not contribute to the conviction. The strength of the state's evidence was enough to render harmless any potential effect the business card evidence might have had on the jury. Because we conclude that any error in the admission of the business card evidence was harmless, we overrule appellant's second of assignment of error.

## IV. Conclusion

{¶ 52} For the foregoing reasons, appellant's two assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

JAMISON, P.J., and EDELSTEIN, J., concur.

————————————

---

[3] *Smith* and *Morris* involved a harmless-error analysis of the admission of other-acts evidence under Evid.R. 404(B). We determine the same analysis is fairly applied here.