[Cite as *State v. Frazier*, 2025-Ohio-2992.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-49 |
| | | (C.P.C. No. 23CR-4333) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Juan L. Frazier, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 21, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Mark R. Wilson*, for appellee.
**Argued:** *Mark R. Wilson.*

**On brief:** *Todd W. Barstow*, for appellant.
**Argued:** *Todd W. Barstow.*

APPEAL from Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Juan L. Frazier, appeals from a December 21, 2023 judgment entry of the Franklin County Court of Common Pleas sentencing him to an aggregate indefinite term of 9 years with the potential maximum term of 12 years in prison for convictions, pursuant to a jury verdict, of felonious assault and having weapons while under disability. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On August 25, 2023, a Franklin County Grand Jury indicted Frazier of one count of aggravated robbery in violation of R.C. 2911.01, a felony of the first degree (Count One); two counts of felonious assault in violation of R.C. 2903.11, felonies of the second degree (Counts Two and Three); and one count of having weapons while under disability in

violation of R.C. 2923.13, a felony of the third degree (Count Four). Counts One through Three each included a three-year firearm specification in violation of R.C. 2941.145(A) and a repeat violent offender specification in violation of R.C. 2941.149(A). Frazier entered a plea of not guilty and counsel was appointed in this case. This matter proceeded to trial on November 27, 2023, at which the following evidence was adduced.[1]

{¶ 3} Kofi Owusu-Ansah is a patrol officer with the Columbus Division of Police. (Nov. 28, 2023 Tr. Vol. II at 25.) On August 13, 2023, Owusu-Ansah responded to a shooting in the area of Tacoma and Covington near Capri Bowling Lanes. (Tr. at 28.) Owusu-Ansah arrived at the scene and noticed a wooded area near the bowling alley that was the site of a homeless camp. (Tr. at 30, 37.) Upon arrival, several individuals approached and yelled, "Hey, he's in here, he's in here." (Tr. at 30.) As Owusu-Ansah entered the camp, he noticed a gun laying on the ground by the entrance. (Tr. at 31-32.) Owusu-Ansah heard the victim, later identified as A.A., state, "Juan shot me, Juan shot me." (Tr. at 31.) A tourniquet was placed on A.A.'s leg before he was ultimately transported to the hospital. (Tr. at 33, 35, 39.) According to Owusu-Ansah, the suspect, later identified as Frazier, was then located and taken into custody. (Tr. at 34.) On cross-examination, Owusu-Ansah acknowledged that he observed a wound on Frazier's forehead who appeared "somewhat dazed and confused[.]" (Tr. at 50.)

{¶ 4} Detective Randy Van Vorhis was the secondary detective in this case. (Tr. at 56.) Van Vorhis testified to various photographs taken at the crime scene and of A.A. at the hospital. (Tr. at 59-60, 76.) Van Vorhis observed that A.A. sustained wounds to his forehead, shoulder, and legs. (Tr. at 78.) Van Vorhis also served as the blind administrator of the photo array to A.A. (Tr. at 76, 83.) Van Vorhis testified that he did not know who the suspect was during the administration of the photo array. (Tr. at 82.) A.A. picked the photograph later identified as Frazier. (Tr. at 83-85.) According to Van Vorhis, A.A. stated, "[Frazier] shot him and made threats." (Tr. at 84-85.)

{¶ 5} Keltin Melvin, a police officer with the Columbus Division of Police, was dispatched to the crime scene on the night in question. (Nov. 29, 2023 Tr. Vol. III at 16-

---

[1] Prior to the start of trial, the state dismissed Count Three of the indictment, felonious assault, in violation of R.C. 2903.11, a felony of the second degree. (May 21, 2024 Order.) Of note, Frazier elected not to waive his right to a jury regarding the having weapons while under disability charge. (Nov. 27, 2023 Tr. Vol. I at 4-5.)

19.) Melvin testified that he secured the firearm while wearing gloves and placed it in the police cruiser. (Tr. at 22.) Melvin later observed A.A. on the ground and stated that there were "puddles of blood next to [A.A.]." (Tr. at 22.) Melton noted A.A. had a gunshot wound in each of his legs and possibly his shoulder. (Tr. at 23.) Melvin identified Frazier as the potential suspect, ordered him out of a tent, and placed him in handcuffs. (Tr. at 24.)

{¶ 6} A.A. lived at the homeless camp by Capri Bowling Lanes in August 2023. (Tr. at 32-33.) According to A.A., Frazier had stayed at the camp from "time to time," and he has known Frazier for over one year. (Tr. at 34-36.) There were other individuals, such as Micah Fraker and David Patton, who also lived at the camp during this period. (Tr. at 36.) According to A.A., Frazier came to the camp on the night in question seeking money from Fraker and to take a scooter "that wasn't his." (Tr. at 38.) That night, A.A. could hear Frazier and someone else outside. (Tr. at 38.) A.A. observed Frazier and another individual walking toward Fraker's "establishment."[2] (Tr. at 39.) A.A. testified that Frazier was pulling at Fraker's gate when he approached to ask why he was at the camp. (Tr. at 40.) "I was out there, there might have been a couple words and then he was pulling a gun out." (Tr. at 40.) When A.A. asked him to leave, Frazier started "talking about shooting everybody and we can't make him do anything." (Tr. at 41.) In response to Frazier's statements, A.A. pulled out a knife. A.A. testified that he had a knife because it was a camping tool. (Tr. at 54.) A.A. testified that Frazier pulled the gun out first. (Tr. at 44.) "I was trying to talk him out of the whole e[s]calation. We just wanted him to go away." (Tr. at 44.)

{¶ 7} According to A.A., Frazier said, " 'You think I won't? You think I won't?' Then the shot goes off, and I feel my heel just hit the ground really hard, or felt it hit the hard, and then started -- I yell and charge at him, and then other shots are going off and I hit the ground, and then next thing I know, [Patton] and [Fraker] are jumping on him to hold him down and they are yelling, I realized I had been shot a couple times." (Tr. at 42.) A.A. explained that he charged Frazier because there were apartments and children in the area. (Tr. at 47.) A.A. stated that his goal was to "[s]ubdue. Get the gun away [from Frazier]." (Tr. at 47.) Ultimately, A.A., Patton, and Fraker were able to subdue Frazier. (Tr. at 49.)

---

[2] "Establishments" refers to tent communities or encampments where individuals experiencing homelessness live.

A.A. estimated that Frazier fired the gun six to seven times in total. (Tr. at 46.) A.A. was shot once in his left leg, once in his right leg, and once in his right shoulder. (Tr. at 45.) A.A. denied that he cut or stabbed anyone with the knife. (Tr. at 54.) A.A. was hospitalized at Riverside Hospital for ten days. (Tr. at 60.) A.A. indicated in a photo array that the person that shot him was pictured in Photo No. 2, which he identified as Frazier. (Tr. at 67, 70.) A.A. also identified Frazier in the courtroom as the individual that shot him on August 13, 2023. (Tr. at 71.)

{¶ 8} On cross-examination, A.A. conceded that he approached Frazier and told him that he was not welcome in the camp. (Tr. at 81-82.) A.A. also acknowledged that the knife was in a holster but was not sure if it was visible as it was dark outside. (Tr. at 82-83.)

{¶ 9} Fraker testified that he lived in the homeless camp by Capri Bowling Lanes in August 2023. (Tr. at 102.) According to Fraker, while eight to nine people would visit, four to five people consistently stayed in the camp. (Tr. at 104.) Fraker has known Frazier for three to four years. (Tr. at 104.) On August 13, 2023, Frazier tried to come into Fraker's establishment, kicked his door, and "holler[ed] a bunch of stuff about . . . damage to the property or shooting people, whatever, whatever, he said he wasn't playing." (Tr. at 107.) Fraker observed a gun in Frazier's hand while he was kicking his door. (Tr. at 110.) Fraker noted that A.A. did not have a knife in his hand when he approached. (Tr. at 146.) Fraker recalled hearing Frazier state to A.A, "I'll shoot you." (Tr. at 115.) Frazier then fired one round into the ground and a second one hit A.A. in the left leg, a third one hit A.A.'s right leg, and a fourth one hit A.A.'s shoulder. (Tr. at 116.) Fraker was asked by law enforcement to identify in a photo array anyone he saw on the night in question. (Tr. at 128.) Fraker identified Frazier's photograph in the photo array. (Tr. at 131.) When asked why he circled Frazier's photograph, Fraker explained, "Because that's the guy that came to camp with the gun and shot my friend." (Tr. at 131.)

{¶ 10} Ian Pruitt is a detective with the Columbus Division of Police. (Tr. at 157.) On August 13, 2023, Pruitt was dispatched to a shooting near Capri Bowling Lanes. (Tr. at 159.) Pruitt testified to photographs of Frazier taken at the hospital. (Tr. at 161.) Pruitt also created the photo array shown to Fraker. (Tr. at 180.) Based on Fraker's response, Pruitt determined that Fraker identified Frazier as the shooter in the photo array. (Tr. at 193.)

{¶ 11} Benjamin Jeschke is a forensic scientist employed at the Columbus Division of Police Crime Laboratory. (Nov. 30, 2023 Tr. Vol. IV at 200.) Jeschke was asked to determine the operability of a firearm and compare that firearm to cartridge casings that were collected at the scene. (Tr. at 213.) Jeschke concluded that the firearm in question was operable, and the six cartridge cases were fired out of the pistol recovered from the crime scene. (Tr. at 224, 228-229.)

{¶ 12} Colleen Hague is a forensic scientist at the Columbus Division of Police Crime Laboratory. (Tr. at 16.) Hague conducted a DNA analysis on a blood-stained area of the firearm, an unstained portion of the firearm, and a magazine collected from the crime scene. (Tr. at 25.) Hague found the blood stain included a mixture of two DNA profiles. (Tr. at 36.) While Patton could not be eliminated as a contributor to the profile, Frazier and Jason Bell could be excluded as contributors. (Tr. at 37.) Another unknown male was a contributor from that same area of the gun. (Tr. at 38.) Hague explained that it is possible to touch items and not leave DNA behind and there can also be "scenarios where their DNA could potentially be on the item, but we have so much DNA from other individuals that we aren't able to detect theirs." (Tr. at 39.) Hague noted there are different factors regarding whether DNA remains on an item such as "if anything is potentially wiped or undergoes certain environmental conditions that can remove[] or damage DNA that's present." (Tr. at 39-40.) The second part of the analysis concerned the part of the firearm that was not stained. (Tr. at 40.) Hague found that the unstained part of the firearm had a DNA combination of three individuals. Hague stated that the DNA combination included one major contributor and two minor contributors. Hague concluded that Patton could not be excluded, while Frazier and Bell could be excluded, as the major contributor of the profile. (Tr. at 41.) The DNA sample of the two minor contributors was not of a sufficient quality and quantity to make a determination. (Tr. at 42.) Finally, the swabs from the DNA on the magazine of the gun were insufficient for comparison purposes or CODIS entry. (Tr. at 43.)

{¶ 13} The parties stipulated that, on or around April 7, 2015, Frazier was convicted in the Cuyahoga County Court of Common Pleas of domestic violence, a felony of the third degree, in violation of R.C. 2919.25. (Tr. at 62.) The state then rested its case with the understanding that the matter would remain open regarding the repeat violent offender

specification pending the jury's verdict. (Tr. at 64.) Counsel for Frazier proceeded to move for a Crim.R. 29 dismissal, which the trial court denied. (Tr. at 64.)

{¶ 14} Frazier testified in his own defense. On August 13, 2023, Frazier visited the homeless camp behind Capri Bowling Lanes to seek repayment of a loan. (Tr. at 68-69.) When Fraker stated that he had no money, Frazier proceeded to leave the campsite. (Tr. at 70.) According to Frazier, A.A. and Patton cut him off before he could leave. (Tr. at 70.) Frazier testified that A.A. and Patton both had weapons in their hands. (Tr. at 72.) During the discussion, A.A. and Patton attacked him. (Tr. at 71.) Frazier stated that he suffered injuries to his shoulder and clavicle before being knocked unconscious. "I could feel people stomping and pouncing and jumping on me." (Tr. at 73.) Frazier was taken to the hospital. Frazier was discharged after two days before being readmitted for surgery on his collarbone and to monitor his head. (Tr. at 73-74.) Frazier denied that he ever possessed a firearm or threatened Fraker. (Tr. at 74-75.)

{¶ 15} On cross-examination, Frazier stated that he was attacked unprovoked and that he did not see anybody at the camp with a firearm. (Tr. at 76-77.) Frazier denied that he told police someone else in the community shot A.A. (Tr. at 81.) Frazier also denied that he even knew A.A. was shot at all that night. (Tr. at 92.) The defense rested and renewed its prior Crim.R. 29 motion, which the trial court denied. (Tr. at 94.)

{¶ 16} On December 1, 2023, the jury returned verdicts finding Frazier guilty of felonious assault and having weapons while under disability. The jury also found Frazier guilty of the three-year firearm specification included with the felonious assault. Frazier was found not guilty of aggravated robbery. On December 21, 2023, the trial court held a sentencing hearing pursuant to R.C. 2929.19. Of note, the state dismissed the outstanding repeat violent offender specification. The trial court concluded that prison was mandatory as to the felonious assault and the firearm specification under R.C. 2929.13(F). The trial court imposed an aggregate indefinite minimum term of 9 years with a potential maximum term of 12 years in prison.

{¶ 17} Frazier filed a timely appeal.

## II. ASSIGNMENT OF ERROR

{¶ 18} Frazier asserts the following sole assignment of error for our review:

THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTIUTTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF FELONIOUS ASSAULT AND HAVING WEAPONS UNDER DISABILITY, AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF EVIDENCE.

## III. ANALYSIS

{¶ 19} In his sole assignment of error, Frazier contends that there is insufficient evidence to support Frazier's convictions for felonious assault and having weapons while under disability. Frazier also contends that the verdicts are against the manifest weight of the evidence. In support of his assignment of error, Frazier's argument, in its entirety, amounts to the following sentences:

> Frazier went to the homeless camp, his former residence, to retrieve his property. Once there, he was assaulted by other camp denizens. He was injured to the extent that he was hospitalized. Interestingly, despite testimony that Frazier shot AA with the recovered pistol, only Fraker's DNA was found on it. T. Vol. IV, 16-57; Exhs. G; H. Also, review of Fraker's testimony revealed that he never admitted to touching or handling the pistol. (T. Vol. III, 100-150). Interesting.

> The State failed in its burden both as to weight and sufficiency and this Court should grant appropriate relief to Appellant.

(Appellant's Brief at 2-3.)

{¶ 20} As a preliminary matter, our review of Frazier's assignment of error reveals, in fact, two distinct issues for review: (1) whether there was sufficient evidence to support Frazier's convictions, and (2) whether the judgment was against the manifest weight of the evidence. While appellate counsel should have raised these potential issues as two separate assignments of error, *see* App.R. 16(A), in the interest of justice, we will address each issue as best we can discern.

{¶ 21} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively distinct. *State v. King*, 2025-Ohio-918, ¶ 19 (10th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Concerning the former, " 'whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at

trial.' " *King* at ¶ 20, quoting *State v. Harris*, 2023-Ohio-3994, ¶ 14 (10th Dist.), citing *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.). An appellate court "essentially assume[s] the state's witnesses testified truthfully and determine[s] if that testimony and any other evidence presented at trial satisfies each element of the crime." *Harris* at ¶ 14, citing *State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), citing *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Legal sufficiency is a question of law that considers whether the state's evidence passes a " 'test of adequacy.' " *State v. Elkhabiry*, 2025-Ohio-1028, ¶ 45 (10th Dist.), quoting *Thompkins* at 386. Thus, evidence is legally sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to find that the state proved each element of the offense beyond a reasonable doubt. *State v. Jamii*, 2023-Ohio-4671, ¶ 43 (10th Dist.), citing *Harris* at ¶ 14.

{¶ 22} Conversely, a challenge under manifest weight addresses the evidence's effect in inducing belief. *State v. Thomas*, 2024-Ohio-5662, ¶ 16 (10th Dist.), citing *State v. Stewart*, 2024-Ohio-1448, ¶ 23 (10th Dist.), citing *State v. Cassell*, 2010-Ohio-1881, ¶ 38 (10th Dist.), citing *State v. Wilson*, 2007-Ohio-2202, ¶ 25. Manifest weight challenges the credibility of the evidence presented and considers whether the state met its burden of persuasion. *Thomas* at ¶ 16, citing *State v. R.J.C.*, 2024-Ohio-1670, ¶ 30 (10th Dist.). " 'Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis.' " *R.J.C.* at ¶ 30, quoting *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *King* at ¶ 22, citing *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), citing *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 23} The manifest-weight-of-the-evidence standard requires this court to consider the state's evidence as an additional or "thirteenth juror." *Elkhabiry* at ¶ 37, citing *Thompkins* at 387. " 'To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.' " *Id.*, quoting *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal under

the manifest weight of the evidence is only appropriate in "exceptional case[s] in which the evidence weighs heavily against the conviction." *Thompkins* at 387. Although a reviewing court considers credibility when assessing the manifest weight of the evidence, the court must be cognizant that determinations concerning witness testimony, and the weight of testimony, are primarily for the trier of fact. *King* at ¶ 24, citing *Harris* at ¶ 17, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. An appellate court should afford the jury's determination great deference as they were "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." (Citations omitted.) *Thomas* at ¶ 17.

{¶ 24} Frazier was convicted of felonious assault and having weapons while under disability. A person commits felonious assault when they knowingly "(1) [c]ause serious physical harm to another or . . . (2) [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A). A defendant commits the offense of having weapons while under disability when they "knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: . . . The person . . . has been convicted of any felony offense of violence . . . " R.C. 2923.13(A)(2).

{¶ 25} Upon review, we find there is sufficient evidence to find Frazier committed felonious assault and having weapons while under disability.

{¶ 26} A.A. testified that he was living at the homeless camp by Capri Bowling Lanes in August of 2023. (Tr. Vol. III at 32-33.) A.A. testified that Frazier was pulling at Fraker's gate when he approached to ask why he was at the camp. "I was out there, there might have been a couple words and then he was pulling a gun out." (Tr. at 40.) When A.A. asked him to leave, Frazier started "talking about shooting everybody and we can't make him do anything." (Tr. at 41.) In response to Frazier's statements, A.A. pulled out a knife. "I was trying to talk him out of the whole e[s]calation. We just wanted him to go away." (Tr. at 44.) A.A. testified that "[Frazier] shot me in the leg and I charged at him. Then acquired two more shots, then we hit the ground." (Tr. at 85.) Ultimately, A.A., Patton, and Fraker were able to subdue Frazier. (Tr. at 49.) A.A. denied that he cut or stabbed anyone with the knife. (Tr. at 54.) Fraker corroborated much of A.A.'s version of events. According to

Fraker, Frazier tried to come in his establishment, kicked his door, and "holler[ed] a bunch of stuff about . . . damage to the property or shooting people, whatever, whatever, he said he wasn't playing." (Tr. at 107.) Fraker observed a gun in Frazier's hand while he was kicking his door. (Tr. at 110.) Fraker recalled hearing Frazier state to A.A, "I'll shoot you." (Tr. at 115.) Frazier then fired one round into the ground and a second one hit A.A. in the left leg, a third one hit his right leg, and a fourth one hit his shoulder. (Tr. at 116.)

{¶ 27} Frazier appears to contend that there was insufficient evidence, and the verdict was against the manifest weight of the evidence, because it was Fraker's, not Frazier's, DNA on the gun. (Appellant's Brief at 2.) As an initial matter, the record flatly contradicts this claim. Hague testified that the only DNA that was not excluded on any of the items tested was from Patton. The various accounts at trial support why Patton's DNA was on the firearm. A.A. and Pruitt testified that Patton had the gun last and provided it to law enforcement. (Tr. Vol. III at 49, 55, 163-165.) It is logical that because Patton held the gun last, his DNA was on the firearm. Hague also provided an explanation as to why Frazier's DNA was not on the firearm. Hague explained that it is possible to touch items and not leave DNA behind and there can also be "scenarios where their DNA could potentially be on the item, but we have so much DNA from other individuals that we aren't able to detect theirs." (Tr. Vol. IV at 39.) Regardless of the lack of DNA evidence, there was substantial testimony that Frazier committed the offenses in this case. First, Owusu-Ansah testified that he observed A.A., while lying on the ground in the wooded area, state, "Juan [Frazier] shot me, Juan [Frazier] shot me." (Tr. Vol. II at 31.) Both A.A. and Fraker separately identified Frazier as the shooter at trial and through a photo array. (Tr. at 67, 70, 131.) When asked why he circled Frazier's photograph, Fraker explained, "Because that's the guy who came to the camp with the gun and shot my friend." (Tr. Vol. III at 131.) Because both A.A. and Fraker have known Frazier for an extended period, it is highly unlikely that this is an instance of mistaken identity. *See State v. Horton*, 2011-Ohio-1387, ¶ 31 (10th Dist.) (finding "mistaken identity was highly unlikely because the victims and defendant knew each other").

{¶ 28} Concerning the having weapons while under disability conviction, the parties stipulated that, on or around April 7, 2015, Frazier was convicted in the Cuyahoga County Court of Common Pleas of domestic violence, a felony of the third degree, in violation of

R.C. 2919.25. (Tr. Vol. IV at 62.) Based on the testimony at trial, there is sufficient evidence that a jury could find that Frazier acquired, carried, and used a firearm during the altercation.

{¶ 29} Frazier also appears to argue that both A.A.'s and Fraker's testimony was not credible. Frazier testified at trial that he was attacked unprovoked by Patton, A.A., and Fraker. (Tr. at 76-77.) Frazier denied that he had a firearm with him or that he even touched the firearm. (Tr. at 72.) Credibility, however, is wholly irrelevant to a sufficiency of the evidence analysis. "This is so because 'in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.' " *State v. Bowman*, 2025-Ohio-1795, ¶ 41, quoting *State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.). Thus, we find the state presented sufficient evidence to support Frazier's conviction for both felonious assault and having weapons while under disability.

{¶ 30} Turning to the manifest weight of the evidence, Frazier argues that the verdict should be overruled based on the lack of DNA evidence and the lack of credibility of A.A. and Fraker. We find Frazier's arguments without merit. The jury heard testimony from Hague regarding the lack of Frazier's DNA evidence on the gun and decided what weight to give this evidence. The jury was free to believe Frazier's account of events as well as the accounts from A.A. and Fraker. "The testimony of one witness, if believed by the jury, is enough to support a conviction." (Further quotation marks deleted.) *Bowman* at ¶ 46, quoting *State v. Steward*, 2019-Ohio-5258, ¶ 17 (10th Dist.), quoting *State v. Patterson*, 2016-Ohio-7130, ¶ 33 (10th Dist.). Moreover, " '[a] conviction is not against the manifest weight of the evidence because the jury chose to believe the state's version of events over the defendant's version.' " *State v. Abdullahi*, 2018-Ohio-5146, ¶ 30 (10th Dist.), quoting *State v. Hawk*, 2013-Ohio-5794, ¶ 59 (10th Dist.). Considering all the evidence together, Frazier's conviction is not against the manifest weight of the evidence as the jury did not clearly lose its way by finding that Frazier committed both felonious assault and having weapons while under disability.

{¶ 31} Accordingly, Frazier's sole assignment of error is overruled.

## IV.  CONCLUSION

{¶ 32}  For the foregoing reasons, Frazier's sole assignment of error is overruled, and the judgment of the Franklin County Court of Commons pleas is affirmed.

*Judgment affirmed.*

BOGGS and LELAND, JJ., concur.

————————————